# Illinois Official Reports

## Supreme Court

---

### *People v. Wright*, 2017 IL 119561

---

| | |
|---|---|
| Caption in Supreme Court: | THE PEOPLE OF THE STATE OF ILLINOIS, Appellant, v. EUGENE WRIGHT, Appellee. |
| Docket No. | 119561 |
| Filed | September 21, 2017 |
| Rehearing denied | November 20, 2017 |
| Decision Under Review | Appeal from the Appellate Court for the First District; heard in that court on appeal from the Circuit Court of Cook County, the Hon. Timothy Chambers, Judge, presiding. |
| Judgment | Appellate court judgment affirmed in part and reversed in part. Circuit court judgment affirmed. |
| Counsel on Appeal | Lisa Madigan, Attorney General, of Springfield, and Anita Alvarez, State's Attorney, of Chicago (Alan J. Spellberg, Michelle Katz, Annette Collins, and Jon Walters, Assistant State's Attorneys, of counsel), for the People. |
| | Michael J. Pelletier, State Appellate Defender, Patricia Mysza, Deputy Defender, and Peter Sgro, Assistant Appellate Defender, of the Office of the State Appellate Defender, of Chicago, for appellee. |

Justices                    JUSTICE THEIS delivered the judgment of the court, with opinion.

Chief Justice Karmeier and Justices Freeman, Thomas, Kilbride, Garman, and Burke concurred in the judgment and opinion.

## OPINION

¶ 1       This appeal arises from the conviction of defendant, Eugene Wright, of armed robbery with a firearm (720 ILCS 5/18-2(a)(2) (West 2010)) following a jury trial in the circuit court of Cook County. Prior to being allowed to represent himself, defendant was admonished by the circuit court pursuant to Illinois Supreme Court Rule 401(a) (eff. July 1, 1984) but was incorrectly informed of the potential maximum sentence of the charged offense. The appellate court reversed and remanded for a new trial based upon this incorrect admonishment while affirming on all other grounds addressed. 2015 IL App (1st) 123496, ¶ 86. For the reasons that follow, we affirm in part and reverse in part the appellate court's judgment.

¶ 2                                    BACKGROUND

¶ 3       Defendant and codefendant, Michael Morgan, were charged with armed robbery with a firearm in connection with the December 26, 2010, robbery of a Bakers Square restaurant at 7131 North Western Avenue in Chicago.[1]

¶ 4       At the grand jury proceedings on August 15, 2011, Detective Allen Lee testified that he investigated the robbery at the restaurant. According to his testimony, defendant and codefendant walked into the restaurant, and codefendant announced a robbery. The two men exited after taking money from the safe. Detective Lee testified that codefendant had the handgun that was used in the crime, that codefendant had time to dispose of the weapon before he was apprehended by police, and that no weapon was recovered. Detective Lee also testified that defendant was positively identified by one of the victims of the robbery and by Chicago police officer Paul Cirrincione, who had been staking out the restaurant. The grand jury returned a true bill for armed robbery with a firearm.

¶ 5       On February 7, 2011, defendant was arraigned. He was represented at the hearing by a public defender. Defendant informed the court that he would not agree to continuances. The public defender told the court that she would have to withdraw as counsel, as she was not ready for trial. After the public defender sought a continuance to order discovery, defendant told the court that he wanted to hire his own attorney, and the case was continued.

¶ 6       On February 24, 2011, defendant advised the court that he had not retained his own counsel and indicated that he wished to proceed *pro se*. The trial court informed him that he had a right to an attorney, but the court would not appoint counsel other than the one from the public defender's office. The court also informed defendant that he had the right to represent himself but that if he did so he would be held to the same standards as an attorney. The court admonished defendant that he was charged with armed robbery in two different cases and that he could possibly be sentenced to consecutive sentences with a range of 21 to 45 years in

_____

[1]Codefendant Morgan is not a party to this appeal.

prison for each conviction.[2] After the State informed the court that defendant was eligible for a maximum sentence of 60 years in prison because of his criminal background, the court admonished defendant that he could be eligible for an extended-term sentence with a maximum term of 60 years' imprisonment. Defendant reiterated that he wanted to proceed *pro se*.

¶ 7 On March 1, 2011, the trial court admonished defendant again pursuant to Rule 401(a). The court informed defendant, *inter alia*, that based upon his criminal history and the use of a handgun during the offense, he faced concurrent sentences of 21 to 60 years in prison on the charged offenses. During questioning by the trial court, defendant represented that he had completed two years of college and had experience with the criminal justice system. The trial court ultimately allowed defendant to proceed *pro se*.

¶ 8 On July 17, 2012, defendant's jury trial commenced.

¶ 9 Martin Perez, the manager of the Bakers Square restaurant at 7131 North Western Avenue, testified that prior to the robbery, he had received a few e-mails from his employer that two black men, both about six feet tall, had robbed another Bakers Square restaurant in the area. On December 26, 2010, shortly before 11 p.m., Michael Morina, a waiter at the restaurant, told Perez that someone wanted to place an order to go. Perez went to the front of the restaurant and saw codefendant. He was wearing a grey hoodie and a white hat. Perez asked codefendant if he could help him. Codefendant turned around and lifted his hoodie to reveal what "looked like a black automatic, black gun" tucked into the waistband of his pants. Codefendant informed him, " '[t]his is a robbery; take me to the office.' " Perez testified that he was sure the gun was an actual firearm. He thought it was a semiautomatic pistol and related that he had experience firing such guns.

¶ 10 Perez further testified that he observed defendant enter the restaurant and approach the counter. Defendant was wearing a black hoodie, blue jeans, and a black headband or hat. Perez walked toward the office with codefendant behind him. While he was walking, Perez "felt something sharp in [his] back," which he thought was a gun. Once in the office, codefendant ordered Perez to open the safe and give him the money inside. Perez complied and gave codefendant a deposit bag marked "Bakers Square" as well as some loose bills. Footage from a surveillance camera inside Perez's office was shown to the jury. Perez identified defendant on the video as the man who came into the office after codefendant and grabbed rolls of coins from the safe.

¶ 11 Perez testified that after he gave codefendant the money, codefendant told him to gather all of his employees. Perez asked Morina, Tsehayens Tsegaye, a waitress, and Leo Martinez, a cook, to come toward the kitchen. Codefendant then told all of them to throw their cell phones into a garbage can. He also demanded Morina's tip money, and Morina complied. Codefendant ordered all of the employees into the walk-in cooler and told them to wait there for five minutes before exiting. Once inside, Perez pulled the alarm located inside. About 15 minutes after the police arrived, Perez was asked to look through the blinds of the restaurant at two suspects standing in the parking lot. Perez positively identified codefendant as the man with the gun. He also positively identified defendant as the second offender.

---

[2]Defendant was charged with the December 11, 2010, robbery of another Bakers Square restaurant in Chicago, which is not at issue in this appeal.

¶ 12    Tsegaye and Morina testified consistently with Perez. Tsegaye testified that when she asked codefendant why he wanted her to throw her cell phone into the garbage, he told her she was being robbed and lifted his shirt up to reveal the handle of a gun in his waistband. She identified codefendant as the man who had the gun but did not view the second person at the show-up because she did not see his face. Morina testified that he also observed the handle of codefendant's gun. He had seen guns before and believed it to be a "9 millimeter pistol." Morina identified codefendant at the show-up. He testified that during the robbery he also observed another individual in a black hooded sweatshirt going toward the manager's office.

¶ 13    Officer Cirrincione testified that on December 26, 2010, at 10:30 p.m., he and Officer Tracy Walczak started conducting surveillance of the Bakers Square restaurant on Western Avenue. They chose that time because a nearby Bakers Square had recently been robbed close to closing. The officers had been informed that the other robbery had been carried out by two black males in their late twenties or early thirties. The two men had been observed leaving that location in a dark or black van with tinted windows.

¶ 14    Officer Cirrincione further testified that on December 26, 2010, he and his partner were in an unmarked vehicle approximately 100 feet from one of the entrances to the restaurant. Shortly before 11 p.m., he observed two men who fit the general description of the subjects leave the restaurant and walk quickly south on Western Avenue. The officers followed the two men by car as they walked east onto Estes Street. Officer Cirrincione asked them to approach the car, and they fled on foot in different directions. The man he identified as defendant was wearing blue jeans, a black hoodie, and something covering part of his head. He ran east on Estes Street while the man he identified as codefendant ran southwest to a nearby mini-mall parking lot. Officer Walczak got out of the car and chased codefendant on foot.

¶ 15    Officer Cirrincione testified that he drove the car around the alley east of the mini-mall in an attempt to cut off codefendant. At the beginning of the chase, he briefly lost sight of codefendant. Officer Cirrincione eventually got out of the car and chased codefendant on foot. While in pursuit, he received a radio call that the Bakers Square restaurant had been robbed. He continued the foot chase until codefendant slipped in front of a house at 2322 West Greenleaf Street. He and other officers were able to detain codefendant there. A search of codefendant's person revealed a night deposit bag labeled "Bakers Square," which contained a large bundle of cash. They also discovered a separate large bundle of loose bills in his pocket. The police searched the surrounding area, which was covered by a large amount of snow. They were unable to locate a firearm.

¶ 16    Sergeant Ken Lewandowski testified that after codefendant was detained, he headed back toward the Bakers Square restaurant. On Western Avenue, he noticed a black conversion van with tinted windows, which was similar to the description of the van used in the earlier robbery. He radioed for officers to stop the van, and several responded.

¶ 17    Sergeant Lewandowski further testified that officers brought defendant and codefendant to the restaurant to conduct show-ups. Sergeant Lewandowski was inside with the witnesses, who viewed the suspects through the blinds of the restaurant while the suspects were in the parking lot. Perez, Morina, and Tsegaye each individually identified codefendant as one of the offenders. Perez also positively identified defendant as the other offender. Morina and Tsegaye did not view the show-up of defendant because they told police that they did not get a good look at the second offender.

¶ 18    Chicago police officer Eric Killion testified that defendant was the sole occupant of the van that was curbed by police on Western Avenue. Defendant was wearing a black hooded sweatshirt and jeans at the time he was apprehended. Police searched the van and found four rolls of dimes and two rolls of quarters by the front seat.

¶ 19    Detective Lee testified that on December 27, 2010, at approximately 12:30 a.m., he went to the Bakers Square to investigate the robbery. He viewed the surveillance video and interviewed Perez. Detective Lee later viewed surveillance photos of the suspects involved in the earlier robbery at the Bakers Square restaurant at Harlem and Foster Avenues in Chicago. He testified that he inspected the black van defendant had been driving when stopped by police in this case. He found a gray puffy vest on one of the passenger seats that was similar to the one worn by one of the suspects in the surveillance photos of the earlier Bakers Square robbery.

¶ 20    On cross-examination, defendant asked Detective Lee whether he had testified before the grand jury that a weapon had not been recovered. Detective Lee responded, "That is correct. At that date it was not." He further testified in response to a similar question by defendant, "[o]n that date of the incident, no weapon was recovered. A gun was subsequently recovered. When it was recovered, it was undetermined if it was involved in this case or not." After being allowed to review a Chicago police evidence report that contained his detective notes, he further testified that on January 2, 2011, a black Crossman BB gun was observed by a citizen in the street in the vicinity of where one of the suspects was running. Detective Lee requested the BB gun be analyzed by the Illinois State Police for fingerprints in order to possibly link it with one of the two offenders in this case. He testified that no suitable fingerprints were found on the BB gun and that it could not be tied to this case.

¶ 21    Defendant showed Detective Lee photographs of a BB gun that was discovered near Western Avenue and Estes Street. Defendant moved to enter the photos into evidence. The trial court asked if he knew who took the photos and when they were taken. Defendant did not know. Detective Lee stated that he had never seen the photos before. The trial court informed defendant that he could not ask questions about them. Defendant then moved to dismiss the case, asserting that "the State violated the *Brady* Rule by not submitting these pictures to me."

¶ 22    A sidebar conference ensued. The assistant State's Attorney told the court that he had not seen the photos.[3] He further related that he had tendered to defendant the Chicago police crime scene processing report, which detailed that a BB gun had been discovered on January 2, 2011, within the vicinity of the restaurant. The report also disclosed that the BB gun was submitted for fingerprints but it had not yielded any suitable prints linking it to this case. Defendant argued that in addition to a *Brady* violation, the indictment should be dismissed because Detective Lee had provided inaccurate testimony before the grand jury when he testified that no weapon had been recovered.

¶ 23    In response to the assistant State's Attorney's comment that there was no evidence that the BB gun was used in the robbery, defendant was asked by the trial court to make an offer of proof. Defendant responded that codefendant told Detective Lee that he committed the robbery with a black BB gun. Defendant acknowledged that the statement was hearsay and that he needed "the actual person" to testify. The State responded that if defendant was going to call

---

[3]Defendant told the trial court that he received the photos from the Cook County State's Attorney's office.

codefendant "to talk about the BB gun, he can call him to see what he says, but he also gave a statement that he committed this crime with this defendant so he is running a risk." Defendant responded that he had "no problem" with eliciting codefendant's statement. The trial court denied defendant's motion to dismiss the indictment based on a *Brady* violation. Similarly, the trial court denied the motion to dismiss the indictment based upon Detective Lee's purportedly false testimony before the grand jury.

¶ 24   Following the sidebar conference, defendant continued his cross-examination of Detective Lee, who testified that he interviewed codefendant about the crime. When defendant asked him about the conversation, the trial court sustained the State's objection, stating, "[w]e are not going into the statement, the nature of the conversation with [codefendant]."

¶ 25   The State also presented evidence concerning the December 11, 2010, Bakers Square robbery. The jury was instructed to consider this other-crimes evidence related to defendant only for the purpose of identification and *modus operandi*.

¶ 26   Defendant testified on his own behalf and called witnesses. He attempted to call codefendant, but codefendant exercised his fifth amendment right not to testify.

¶ 27   Defendant testified that on December 26, 2010, he was driving south on Western Avenue when police stopped his van around Western Avenue and Pratt Boulevard. The police took him to a nearby Bakers Square restaurant for a show-up. He testified that in December 2010, he was living in Atlanta, Georgia, but was staying with a friend at 6331 South Sangamon Street in Chicago. He denied telling police that prior to being stopped he had driven to 7300 North Bell Avenue to see a woman he had met online. He also denied committing either Bakers Square robbery, knowing codefendant, or having rolls of dimes or quarters in the van that was stopped by police.

¶ 28   Officer Walczak testified that she completed a case report that represented that three complainants of the robbery and another witness positively identified defendant at the show-up. On further questioning, however, she acknowledged that this was in error, as three complainants identified codefendant but only one identified defendant.

¶ 29   Perez testified that he only saw the handle of the gun but that he was "100% sure" that the weapon codefendant displayed was an "actual firearm." Defendant showed him a group exhibit of photos, which included a BB gun. Perez said that the object in one of the photos looked like a gun. He testified that it was unclear, however, whether the gun looked like the type of gun used in the robbery because the photo was blurry.

¶ 30   In rebuttal, Detective Lee testified that defendant told him that prior to being stopped in the van, he had driven to the north side of the city to meet a woman he had contacted on a website. He told Detective Lee that he drove to 7312 North Bell Avenue to see the woman he met online but she had given him a " 'bogus address.' "

¶ 31   At the jury instruction conference, the State asked for an instruction on both armed robbery and the lesser included offense of robbery because defendant had introduced evidence of the BB gun that had been found a week after the robbery in the vicinity of the restaurant. Defendant objected. The trial court explained that the instruction would be given, over his objection, because he "introduced evidence of a gun and then argued that it was a BB gun." The trial court noted, however, that "the [BB] gun in question has not been tied to this case, it's not been identified by anyone as being in the Bakers Square in the possession of [codefendant]

or anyone else; indeed it's not tied to any person at all." The jury was tendered verdict forms for both robbery and armed robbery.

¶ 32    The jury found defendant guilty of armed robbery. At sentencing, the State informed the trial court that defendant was eligible for a maximum sentence of 75 years but sought the imposition of a 60-year sentence.[4] The trial court sentenced defendant to 50 years' imprisonment.

¶ 33    On appeal, defendant raised several issues. He asserted that he was entitled to a new trial because the trial court failed to properly admonish him under Rule 401(a) before allowing him to waive his right to counsel. 2015 IL App (1st) 123496, ¶ 43. This argument was based on the fact that he was incorrectly informed of the potential maximum sentence for the charged offense. *Id.* ¶ 47. The appellate court recognized that defendant had forfeited this issue but held that the trial court did not substantially comply with Rule 401(a) when it informed him that he was eligible for an extended-term sentence up to 60 years in prison for the charged offense, rather than the correct maximum sentence of 75 years. *Id.* ¶¶ 44, 47. Based upon this error, the appellate court held that defendant's waiver of counsel was unknowing and involuntary. *Id.* ¶ 47. The appellate court noted that defendant's case did not fall within any exception where a deficiency in the admonishment had been found not to prejudice a defendant. *Id.* ¶ 51.

¶ 34    The appellate court rejected the remaining issues raised by defendant and found that because it was remanding on other grounds it need not determine whether the trial judge's failure to *sua sponte* provide the jury with the instruction on the definition of a firearm was error. *Id.* ¶¶ 41, 70, 78, 83. The appellate court reversed defendant's conviction and remanded for further proceedings. *Id.* ¶ 86.

¶ 35    This court allowed the State's petition for leave to appeal. Ill. S. Ct. R. 315 (eff. Jan. 1, 2015).

¶ 36                                              ANALYSIS
¶ 37                                          I. State's Appeal
¶ 38    The State contends that the appellate court erred by concluding that the trial court's admonishments failed to substantially comply with Rule 401(a) on the basis that defendant was misinformed as to the maximum potential sentence for armed robbery. The State asserts that the record shows that defendant's waiver of his right to counsel was made knowingly and voluntarily and the sole admonishment he did not receive in no way prejudiced his rights.

¶ 39    The sixth amendment to the United States Constitution (U.S. Const., amend. VI) guarantees an accused in a criminal proceeding both the right to the assistance of counsel and the correlative right to proceed without counsel. *Faretta v. California*, 422 U.S. 806, 832-34 (1975). This court has long recognized that the right to self-representation is "as basic and fundamental as [the] right to be represented by counsel." (Internal quotation marks omitted.) *People v. Nelson*, 47 Ill. 2d 570, 574 (1971). An accused may therefore waive his constitutional right to counsel as long as the waiver is voluntary, knowing, and intelligent. *People v. Haynes*, 174 Ill. 2d 204, 235 (1996) (citing *Faretta*, 422 U.S. at 835). "Although a

---

[4]Based upon a prior armed robbery conviction for an offense committed by defendant within 10 years of the instant offense and excluding time spent in custody, the State asserted that he was eligible for an extended-term sentence of 21 to 75 years, which included a 15-year firearm enhancement.

court may consider the decision unwise, a defendant's knowing and intelligent election to represent himself must be honored out of ' "that respect for the individual which is the lifeblood of the law." ' " *Id.* (quoting *People v. Silagy*, 101 Ill. 2d 147, 180 (1984), quoting *Illinois v. Allen*, 397 U.S. 337, 350-51 (1970)).

¶ 40    Illinois Supreme Court Rule 401(a) governs the trial court's acceptance of an accused's waiver of counsel in Illinois. That rule states:

> "Any waiver of counsel shall be in open court. The court shall not permit a waiver of counsel by a person accused of an offense punishable by imprisonment without first, by addressing the defendant personally in open court, informing him of and determining that he understands the following:
>
> (1) the nature of the charge;
>
> (2) the minimum and maximum sentence prescribed by law, including, when applicable, the penalty to which the defendant may be subjected because of prior convictions or consecutive sentences; and
>
> (3) that he has a right to counsel and, if he is indigent, to have counsel appointed for him by the court." Ill. S. Ct. R. 401(a) (eff. July 1, 1984).

¶ 41    This court has recognized that compliance with Rule 401(a) is required for an effective waiver of counsel. *Haynes*, 174 Ill. 2d at 236 (citing *People v. Baker*, 94 Ill. 2d 129, 137 (1983)). We have recognized for 30 years that "[s]trict technical compliance with Rule 401(a), however, is not always required. Rather, substantial compliance will be sufficient to effectuate a valid waiver if the record indicates that the waiver was made knowingly and voluntarily, and the admonishment the defendant received did not prejudice his rights." *Id.* (citing *People v. Coleman*, 129 Ill. 2d 321, 333 (1989), and *People v. Johnson*, 119 Ill. 2d 119, 132 (1987)).

¶ 42    This court has considered the contours of substantial compliance with Rule 401(a) in several cases. In *Coleman*, relied upon by the State, the defendant filed a motion prior to trial to proceed *pro se*. *Coleman*, 129 Ill. 2d at 331. The trial court admonished the defendant of his right to counsel and, as an indigent, his right to court-appointed counsel. *Id.* The trial court further admonished him of the nature of the charges against him and informed him that the maximum sentence prescribed by law was the death penalty and the minimum sentence prescribed by law was a 20-year term of imprisonment. *Id.* In fact, the minimum sentence possible was natural life imprisonment. *Id.* at 332.

¶ 43    The *Coleman* court held that the trial court had substantially complied with Rule 401(a) in that it had admonished the defendant of his right to counsel, informed him of the nature of the charges against him, and explained that the death penalty was the possible maximum sentence. *Id.* at 333. In holding that the trial court substantially complied with Rule 401(a), we stated: "Where a defendant knows the nature of the charges against him and understands that as a result of those charges he may receive the death penalty, his knowledge and understanding that he may be eligible to receive a lesser sentence pales in comparison." *Id.* at 333-34. In *Coleman*, the record established the defendant knew that the minimum sentence was natural life imprisonment, offered legitimate reasons for waiving his right to counsel, and attempted to manipulate the proceedings by repeatedly refusing the services of counsel. *Id.* at 340. We therefore concluded that the defendant's waiver of counsel, despite the incorrect admonishment of the minimum sentence, was made knowingly and intelligently. *Id.*

¶ 44        Similarly, in *Johnson*, the trial court incorrectly informed the defendant under Rule 401(a) that the minimum sentence was a "number of years" when it was actually natural life in prison. *Johnson*, 119 Ill. 2d at 129. This court held that the admonishment the defendant received substantially complied with the rule despite this error. *Id.* at 132. We held that a review of the entire record indicated that the defendant's waiver of his right to counsel was made knowingly and voluntarily and the sole admonishment that he did not receive in no way prejudiced his rights. *Id.*

¶ 45        Thereafter, in *Haynes*, the defendant asserted that the admonishments were insufficient to satisfy Rule 401(a) because the trial court neglected to include the minimum and maximum sentences possible for a burglary charge. *Haynes*, 174 Ill. 2d at 242. This court held that the information omitted from the admonishments did not invalidate the defendant's waiver of counsel. *Id.* at 243. As in *Coleman* and *Johnson*, the defendant was fully aware of the range of sentences possible for the most serious charge against him, first degree murder, including the possibility of the death sentence. *Id.* Given that, the importance of the defendant having specific knowledge of the minimum and maximum sentences for the significantly less serious charge of burglary paled in comparison. *Id.* Consequently, we held that the trial court's admonishments, despite the omission of the sentences for burglary, substantially complied with Rule 401(a). *Id.*

¶ 46        This court further held in *Haynes* that the record as a whole clearly showed that the defendant's decision to waive counsel was made freely, knowingly, and intelligently. *Id.* The defendant first expressed his desire to represent himself at the outset of the proceedings against him and reiterated that desire in open court on several other occasions. *Id.* at 243-44. Further, several examining doctors at the fitness hearing testified that, during their meetings with the defendant, he was adamant in his desire to represent himself. *Id.* at 244. Consequently, we held that there could be no doubt as to the defendant's choice. *Id.* In addition, testimony at the fitness hearing revealed that the defendant expressed an understanding of the nature of the charges against him, the role an attorney would play, and the fact that the death penalty was a possible sentence. *Id.* With regard to his right to appointed counsel, the defendant was repeatedly advised of that right and, in fact, received the assistance of appointed counsel for a period of time prior to trial. *Id.* Therefore, in *Haynes*, it was evident that the defendant understood that he was entitled to legal representation. *Id.* We concluded that the defendant's waiver of counsel was therefore valid and that reversal for a new trial was not warranted. *Id.*

¶ 47        In contrast, in *People v. Campbell*, this court held there was no compliance, substantial or otherwise, with Rule 401(a). *People v. Campbell*, 224 Ill. 2d 80, 84 (2006). There, the defendant had been accused of an offense punishable by imprisonment. *Id.* The trial court, however, allowed him to proceed *pro se* without making any attempt to inform him of the nature of the charges, the range of possible penalties, or his right to counsel. *Id.* We therefore concluded that his waiver of counsel was invalid and his conviction could not stand. *Id.* at 85.

¶ 48        In this case, the record reveals the following facts. Defendant was arraigned on February 7, 2011. He asserted at the hearing that he would not agree to continuances. The public defender indicated that she would have to withdraw as counsel, as she was not ready for trial. The trial court continued the case for defendant to seek counsel. At the next court date on February 24, 2011, before Judge Lauren Edidin, defendant did not have an attorney. When the trial court asked defendant how long his family indicated it might take to find an attorney, defendant

responded that he was "not giving up [his] right to speedy trial at all." The trial court passed the case to allow defendant to speak to a public defender.

¶ 49 Afterward, the following colloquy occurred:

"THE COURT: Mr. Wright, I gave you some documents and those documents—the offenses were purported to occur on December 11th, 2010 and there is actually some other charges as well, another case that occurred. Well, this says on December 11th as well.

MR. CENAR [Assistant State's Attorney]: One is December 26th and one—it's the 26th on these.

THE COURT: What I gave you says the 26th.

THE DEFENDANT: It does.

THE COURT: Thank you. I have another copy that says the 11th. They were actually both put in.

MR. CENAR: Very good.

THE COURT: So there are actually two cases and I don't know if based on any information if that would be—would that be possible consecutive sentences?

MR. CENAR: It's possible.

THE COURT: It's possible it could be consecutive which would be 2l and then another additional 21 minimum or it could be the maximum 45 and an additional 45; do you understand that?

THE DEFENDANT: I do.

THE COURT: Again, I am going to ask you, I have told you that you would be entitled to have a public defender represent you, is that correct?

THE DEFENDANT: You have told me that.

THE COURT: And currently there's no basis for me to appoint an attorney other than a Public Defender; do you understand that?

THE DEFENDANT: Yes.

THE COURT: You do have the right to represent yourself and I have given you all the bases and tried to give you as much information so that you could understand how serious this case is and how it would be quite challenging for you to do this on your own and if you are convicted after handling this case on your own and you choose to appeal that conviction, you will not then be able to complain that you were not competent to represent yourself; do you understand that?

THE DEFENDANT: I do.

THE COURT: Okay. Understanding that, I believe you are making a very big mistake and I am afraid it may be something that you might regret. Mr. Wright, do you still wish to represent yourself?

THE DEFENDANT: Yes, I do."

¶ 50 Later, based on the State's representation, the trial court clarified that defendant was subject to possible extended-term consecutive sentences with up to 60 years in prison.

¶ 51 On March 1, 2011, Judge William O'Brien re-admonished defendant. The following colloquy ensued:

"THE COURT: This is Mr. Eugene Wright. Okay. Mr. Wright was up the last time February the 24th. I was not here. Judge Edidin was in my stead. And at that time Mr. Wright had indicated that he wished to represent himself. Is that correct, Mr. Wright?

THE DEFENDANT: It is.

THE COURT: All right. What I am going to do is, just so I am clear, I am going to re-admonish you as to your *pro se* rights. Okay? Do you understand that you have—you have indicated that you wish to represent yourself. Is that correct, Mr. Wright?

THE DEFENDANT: It is.

THE COURT: All right. You understand that you have the right to be represented by an attorney, that I would appoint the public defender to represent you. Do you understand that?

THE DEFENDANT: Yes.

THE COURT: Okay. You said—you do not wish to be represented by the public defender, is that correct?

THE DEFENDANT: The thing I want, as I am going to say, I am asking for a speedy trial. And there is a conflict.

THE COURT: Well, that's the situation, Mr. Wright. You know, the public defender is a lawyer on it. And they have to answer ready and demand trial when they are ready to go ahead and do it. And it's hard to ask a lawyer to go ahead and do that when they don't even have the reports in front of them. That is why they don't do that. They have to, at least, wait until they get all the discovery and then they decide. That is the reason that they do that. Otherwise, you are going to come back at them later on if it's not a good result and say, 'Well, wait a minute. You were ineffective.' 'Well, I was ineffective because I did not have all the reports.' So, they are kind of in a catch 22. Do you understand that's why they do not do that right off the bat? But—and that's why they say, if you want to go ahead and do that, you are acting as your own lawyer. So, that's your choice.

THE DEFENDANT: It shouldn't be part of the constitution then if it is a conflict.

THE COURT: Again, it's your right, your right to represent yourself. You understand that?

THE DEFENDANT: Yeah.

THE COURT: All right. So, you have indicated that you do not want the public defender to represent you. Is that correct?

THE DEFENDANT: I am saying there is a conflict. And as long as there is a conflict, it can't get done.

THE COURT: This is the question.

THE DEFENDANT: I heard the question.

THE COURT: Well, it calls for yes or no.

THE DEFENDANT: As long as there is a conflict, it can't get done.

THE COURT: So, you do not want the public defender to represent you?

THE DEFENDANT: As long as there is a conflict, it can't get done.

- 11 -

THE COURT: All right. Do you understand that there is no basis for me to appoint an attorney other than the public defender? Do you understand that?

THE DEFENDANT: Yes.

THE COURT: You understand you have the right to represent yourself. But before I allow you to do so, I must inform you of certain things. First, you are charged with the offense of—11 CR 927 is 1, 2, 3, 4—6 counts of armed robbery. So, it's a Class X offense. And the range is 6 to 30 years. And on Case Number 11 CR 928, you are charged with—it looks like 4 counts of armed robbery. Those cases are not consecutive sentencing. Is that correct, State?

MR. CENAR: Right, Judge.

THE COURT: It's not a consecutive situation.

MR. CENAR: No.

THE COURT: It's a concurrent situation.

MR. CENAR: Yes.

THE COURT: And, also, the range is 6 to 30. Are there any enhancements on these cases as a result of Mr. Wright's—any background?

MR. CENAR: Well, first of all, as charged, he is charged with armed robbery with a firearm. And the minimum is 21 years. It's 6 plus 15 per the statute. And based upon his record, he is extendable.

THE COURT: So, he is looking at 21 through—

MR. CENAR: Through 60.

THE COURT: Through 60 is the range of sentencing that you face. It's a 3-year period of mandatory supervised release. Is it 50 percent time?

MR. CENAR: Yes, 50 percent time.

THE COURT: It's not an 85 percent sentence. All right. Do you understand that?

THE DEFENDANT: Yes.

THE COURT: Okay. How old are you, sir?

THE DEFENDANT: I am 37.

THE COURT: 37. How far did you get in school?

THE DEFENDANT: I have been in college.

THE COURT: How far in college?

THE DEFENDANT: Second year.

THE COURT: Sophomore. And have you ever had any legal training at all?

THE DEFENDANT: No.

THE COURT: Have you ever represented yourself in court before?

THE DEFENDANT: I did on appeal.

THE COURT: On appeal?

THE DEFENDANT: Yes.

THE COURT: And for what kind of a charge was that? Was it a felony or misdemeanor?

THE DEFENDANT: A felony.

THE COURT: How long ago was that?

THE DEFENDANT: It's been about 10 years.

THE COURT: Okay. And so, you have done legal research, is that correct?

THE DEFENDANT: Yes.

THE COURT: Yes?

THE DEFENDANT: Yes.

THE COURT: Okay. Do you know anything about the rules of evidence that apply in a criminal case?

THE DEFENDANT: There are certain things I know.

THE COURT: Okay. Have you ever selected a jury?

THE DEFENDANT: Yes.

THE COURT: You have selected a jury?

THE DEFENDANT: I have been in part of a jury, [Y]our Honor, selection I should say.

THE COURT: As a defendant, have you ever selected a jury?

THE DEFENDANT: No.

THE COURT: No, okay. Do you understand that the prosecutors in this case have tried many cases? They have gone to college and law school. They have passed the bar exam and received training through the State's Attorney's Office. And they know the rules of evidence. You understand that?

THE DEFENDANT: Yes.

THE COURT: You understand that you may be at a great disadvantage of trying this case against them because you too will have to follow those rules of evidence and just like any lawyer is expected to do? When you step into those shoes, you are going to be held to the same standards that any lawyer would be held to. I cannot assist you. Do you understand that?

THE DEFENDANT: Yes.

THE COURT: And once the trial begins, you will not be able to change your mind and say, 'Wait a minute. It doesn't look like this is going too well. Time out. I want to have a lawyer.' No. Once the ship has sailed, the ship has sailed. Do you understand that?

THE DEFENDANT: Yes.

THE COURT: By examining the charges, I will not appoint a stand-by counsel to represent you. So, you won't have a lawyer you can refer questions to in this case. The charges are not that difficult to understand. And I have also considered the nature and gravity of the charge, the expected factual and legal complexity of the proceedings and your abilities and experience. And, so, like I said before, once you begin, you are on your own. Do you understand that?

THE DEFENDANT: Yes.

THE COURT: And if you are convicted—if you are convicted—if you are convicted, on appeal, you would you not be able to complain about your own

competency to represent yourself. Do you understand me? That does not become an issue for you.

THE DEFENDANT: Yes.

THE COURT: All right. Understanding that, I believe you are making a very big mistake. But do you still wish to represent yourself?

THE DEFENDANT: Yes."

¶ 52 After reviewing the above colloquy, the appellate court concluded that because the trial judge informed defendant that the maximum possible sentence he faced was 60 years' imprisonment, rather than the correct 75-year sentence, the admonishments failed to substantially comply with Rule 401(a), amounting to plain error and warranting a new trial. 2015 IL App (1st) 123496, ¶¶ 44, 60. We reject that holding.

¶ 53 Similar to *Coleman*, *Johnson*, and *Haynes*, and in marked contrast to *Campbell*, under the circumstances in this case, there was substantial compliance with Rule 401(a). After defendant initially asserted that he desired to proceed *pro se*, the trial court provided him with a copy of the charging instrument and admonished him that he was subject to a possible sentence of 21 to 60 years for the charged offenses and that he was entitled to have a public defender represent him. At the next court date, defendant was again admonished by the trial court under Rule 401(a). The trial court informed him that he was charged with four counts of armed robbery. He was told that he faced a possible sentencing range of 21 to 60 years for the offenses and that the sentences would be served concurrently. The trial court also informed defendant of his right to appointed counsel. The trial court further informed him that if he proceeded *pro se*, he would be held to the same standards to which a lawyer would be held and, if convicted, he could not complain about his own competency.

¶ 54 We do not diminish the importance of correct admonishments as to the actual maximum sentence allowed. Each case, however, must be evaluated on its own particular set of facts. Based upon the colloquy above, we conclude that the trial court substantially complied with Rule 401(a) when it properly admonished defendant in all respects except when it informed him that he faced a maximum sentence of 60 years in prison, when it was actually 75 years.

¶ 55 We find that defendant's decision to waive counsel was made freely, knowingly, and intelligently. The trial court elicited from defendant that he was 37 years old, had attended two years of college, and had previously represented himself on appeal in a felony case. He expressed his desire to represent himself at the beginning of this case and reiterated that desire a number of times thereafter, even after being informed by the trial court of the potential pitfalls of doing so. We also find compelling the basis given by defendant as to why he wished to represent himself. He repeatedly indicated to the trial court that his reason for not accepting the appointment of the public defender, and instead proceeding *pro se*, was due to speedy trial concerns. Defendant's articulated reason did not hinge on the maximum sentence allowed for the charged offenses. Accordingly, the record establishes that defendant's decision to waive counsel was made knowingly and intelligently. See *Coleman*, 129 Ill. 2d at 336 (holding that the record established that the defendant had specific, legitimate reasons for waiving his right to counsel, including his dissatisfaction with counsel's representation, which demonstrated that he would have waived counsel regardless of the length of the minimum sentence prescribed by law).

¶ 56    Finally, there is no basis for us to conclude that defendant was prejudiced by the trial court's understatement of the potential maximum sentence. Defendant does not even make a bare allegation that he would not have proceeded to represent himself if he had known the possible maximum sentence he faced for armed robbery was actually 75 years, rather than 60 years. *See id.* at 334 (holding that the record contradicted the defendant's assertion that if he had known the actual minimum sentence of the offense was natural life in prison, he would not have proceeded to represent himself). We also note that while defendant was eligible for a 75-year sentence, the State actually asked for the imposition of a 60-year sentence and the trial court imposed a 50-year sentence.

¶ 57    For these reasons, we conclude that despite the trial court's incorrect statement of the maximum potential sentence, the trial court substantially complied with Rule 401(a), and defendant made a voluntary, knowing, and intelligent waiver of counsel prior to being allowed to proceed *pro se*.

¶ 58                              II. Defendant's Cross-Appeal
¶ 59                                  *Grand Jury Proceeding*
¶ 60    Defendant raises several arguments in his cross-appeal. First, he contends that the trial court erred by denying his motion to dismiss the indictment based on his claim that the State presented deceptive evidence to the grand jury through Detective Lee's testimony. According to defendant, if Detective Lee had testified that a BB gun was recovered by police in the vicinity of the restaurant a week after the robbery, the grand jury may not have indicted him for the crime of armed robbery with a firearm.

¶ 61    "Challenges to grand jury proceedings are limited. In general, a defendant may not challenge the validity of an indictment returned by a legally constituted grand jury." *People v. DiVincenzo*, 183 Ill. 2d 239, 255 (1998), *abrogated on other grounds by People v. McDonald*, 2016 IL 118882. A defendant may challenge an indictment that is procured through prosecutorial misconduct. *Id.* The prosecutorial misconduct, however, must rise to the level of a deprivation of due process or a miscarriage of justice. *Id.* at 257.

¶ 62    The due process rights of a defendant may be violated if the State deliberately or intentionally misleads the grand jury, uses known perjured or false testimony, or presents other deceptive or inaccurate evidence. *Id.* To warrant dismissal of the indictment, a defendant must show that the State prevented the grand jury from returning a meaningful indictment by misleading or coercing it. *Id.* at 258.

¶ 63    In support of his argument, defendant relies upon *People v. Oliver*, 368 Ill. App. 3d 690 (2006). There, a police officer falsely testified before the grand jury that he personally witnessed the defendant conducting hand-to-hand narcotics transactions. *Id.* at 691, 695. The officer, however, had not personally observed the transactions but, instead, had relied on another police officer's report. *Id.* at 694. This testimony was found to be particularly deceptive because it concealed its hearsay nature and also mischaracterized the other officer's observations of the transaction. *Id.* at 697. The appellate court concluded that without the officer's misleading testimony, the grand jury would not have found probable cause to indict the defendant. *Id.* at 698-99. Consequently, the appellate court held that the defendant was entitled to a dismissal of the indictment because he had shown that he suffered actual and substantial prejudice due to the officer's testimony. *Id.* at 699.

¶ 64    Here, Detective Lee testified before the grand jury that defendant and codefendant walked into the restaurant and codefendant announced a robbery. The two men exited after taking money from the safe. Detective Lee testified that codefendant had the handgun that was used in the crime. He also testified that defendant was positively identified by one of the victims of the robbery and by Officer Cirrincione.

¶ 65    Defendant cites the following grand jury testimony by Detective Lee to support his claim that the State procured, as in *Oliver*, inaccurate testimony that similarly warrants dismissal of the indictment:

> "Q. A handgun was used in this incident, was being held by Mr. Morgan during the incident?
>
> A. That's correct.
>
> Q. There was time though for Morgan to dispose of the weapon?
>
> A. Yes.
>
> Q. Because it hasn't been recovered, has it?
>
> A. No."

¶ 66    Later, at trial, Detective Lee testified that a week after the robbery, a black Crossman BB gun was observed by a citizen in the street in the vicinity of where one of the suspects was running. Detective Lee requested that the BB gun be analyzed for fingerprints in order to possibly link it with one of the two offenders in this case. He testified that no suitable fingerprints were found on the BB gun and that it could not be tied to this case. The assistant State's Attorney also informed the trial court that he had tendered to defendant the Chicago police crime scene processing report, which stated that a BB gun had been discovered on January 2, 2011, within the vicinity of the restaurant. The report also disclosed that the BB gun had been submitted for fingerprints but it had not yielded any suitable prints linking it to this crime.

¶ 67    Simply put, there is no evidence that the BB gun recovered a week after the robbery was used in the commission of this offense. As the trial and appellate courts below recognized, unlike the officer in *Oliver*, Detective Lee's grand jury testimony cited by defendant was not false because no gun had been recovered and specifically linked to the robbery. Consequently, defendant has not shown that the State prevented the grand jury from returning a meaningful indictment by misleading or coercing it.

¶ 68                          *Sufficiency of the Evidence*

¶ 69    Next, defendant contends that the State failed to prove that he committed robbery while armed with a firearm because the victims only briefly saw the handle of the gun and there was evidence that during the robbery codefendant actually possessed a BB gun.

¶ 70    "When presented with a challenge to the sufficiency of the State's evidence, a reviewing court must determine whether ' "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." ' " (Emphasis in original.) *People v. Ross*, 229 Ill. 2d 255, 272 (2008) (quoting *People v. Collins*, 106 Ill. 2d 237, 261 (1985), quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). Under this standard a reviewing court does not retry the defendant, and the trier of fact remains responsible for making determinations regarding the credibility of

witnesses, the weight to be given their testimony, and the reasonable inferences to be drawn from the evidence. *Id.* A conviction will not be set aside on appeal unless the evidence is so unreasonable, improbable, or unsatisfactory that there remains a reasonable doubt of the defendant's guilt. *Id.*

¶ 71    Defendant was charged with armed robbery in that he, or someone he was accountable for, "[took] property *** from the person or presence of another by the use of force or by threatening imminent use of force" (720 ILCS 5/18-1(a) (West 2010)) and that he, or someone he was accountable for, "carrie[d] on or about his *** person or [was] otherwise armed with a firearm" (720 ILCS 5/18-2(a)(2) (West 2010)). For purposes of this statute, a firearm is defined in section 1.1 of the Firearm Owners Identification Card Act (FOID Act), in pertinent part, as "any device, by whatever name known, which is designed to expel a projectile or projectiles by the action of an explosion, expansion of gas or escape of gas" but specifically excluding, among other items, any pneumatic gun, spring gun, paint ball gun, or BB gun. 430 ILCS 65/1.1 (West 2010); 720 ILCS 5/2-7.5 (West 2010).

¶ 72    In *People v. Washington*, this court considered whether the State presented sufficient evidence of a "dangerous weapon" to prove the defendant guilty of armed robbery, aggravated kidnapping, and aggravated vehicular hijacking. *People v. Washington*, 2012 IL 107993, ¶ 1. The defendant was charged under a previous version of the statute, and the State had to prove that he committed the offenses " 'while armed with a dangerous weapon.' " *Id.* ¶ 9. The jury found the defendant guilty of the charges. *Id.* ¶ 21. On appeal, he argued that the State failed to prove beyond a reasonable doubt that he was armed with a dangerous weapon because no weapon was recovered or introduced into evidence and because no testimony was provided as to the size and weight or metallic nature of the weapon. *Id.* ¶ 24. The appellate court agreed that the State did not present sufficient evidence that the defendant possessed a dangerous weapon and reversed his conviction. *Id.* ¶ 25.

¶ 73    In reversing the appellate court in *Washington*, we relied on the victim's testimony that the defendant had pointed a gun at him, forced him into a truck, and then held a gun to his head while he sat between the defendant and his accomplice in the front seat of a truck. *Id.* ¶ 35. The victim also testified that the defendant pointed the gun at him when he was later forced into the cargo area of the truck. *Id.* We found this evidence established that the victim, for several minutes, had an unobstructed view of the weapon used during the commission of the crime and that he testified that it was a gun. *Id.* We held that, given the victim's "unequivocal testimony and the circumstances under which he was able to view the gun, the jury could have reasonably inferred that defendant possessed a real gun." *Id.* ¶ 36.

¶ 74    In *Ross*, relied upon by defendant, we found the situation to be different. There, we also considered whether the evidence was sufficient to prove that the gun used by the defendant was a dangerous weapon. *Ross*, 229 Ill. 2d at 272. The arresting officer testified that, immediately after the crime, he drove the victim back to where the crime had occurred and the victim spotted the defendant, who was then apprehended by police. *Id.* at 258. The officer further testified that as he approached the defendant, he saw him throw some items into a bush. *Id.* The police retrieved the gun, which was not offered into evidence. *Id.* The officer, however, described the gun as a " '4.5 BB caliber gun with a three inch barrel.' " *Id.* The inventory sheet in the record also listed the gun consistently with the officer's testimony. *Id.* The victim

described the gun as " 'a black, very portable gun,' " which was " 'small' and 'something you can conceal.' " *Id.*

¶ 75    We acknowledged in *Ross* that "our cases conclude that the trier of fact may make an inference of dangerousness based upon the evidence." *Id.* at 276. This court concluded, however, that the evidence presented at the defendant's bench trial was insufficient to support the trier of fact's inference that the "gun" the defendant possessed when he committed the robbery was a dangerous weapon. *Id.* at 277. That is because the evidence showed that the "gun" was actually a small BB gun with a three-inch barrel. *Id.* Moreover, there was no evidence that the gun was loaded, there was no evidence that it was brandished as a bludgeon, and there was no evidence regarding its weight or composition. *Id.* Therefore, we found the evidence precluded a finding that the "gun" used by the defendant was a dangerous weapon. *Id.*

¶ 76    Here, we are asked to assess the sufficiency of the evidence to prove that codefendant possessed a firearm, as defined in the FOID Act, during the robbery. In finding that the evidence proved that the defendant in *Washington* possessed "a dangerous weapon," we relied on the testimony of a single eyewitness and concluded that a rational trier of fact could infer from the testimony that the defendant possessed a "real gun." Our disposition is controlled by the same rationale here. In contrast to *Ross*, Perez testified at trial that codefendant told him "this is a robbery" and lifted his hoodie to reveal what "looked like a black automatic, black gun." He thought it was a semiautomatic[5] and related that he had experience firing such guns. He further testified that while walking toward his office he "felt something sharp in [his] back," which felt like the barrel of a gun. On direct questioning by defendant, Perez testified that he was "100% sure" that the weapon codefendant displayed was an "actual firearm." Tsegaye also testified that codefendant told her she was being robbed and that she saw the handle of a gun in the waistband of his pants. Additionally, Morina testified that he had seen guns before and believed codefendant's gun was a "9 millimeter pistol."

¶ 77    Viewing this evidence in the light most favorable to the State, it was not so unreasonable, improbable, or unsatisfactory that no rational trier of fact could have found that codefendant was armed with a firearm during the commission of the robbery.

¶ 78                            *Exclusion of Codefendant's Statement*

¶ 79    Next, defendant asks us to consider whether the trial court erred by excluding codefendant's alleged statement to Detective Lee that codefendant committed the robbery with a BB gun. He asserts that this hearsay statement was admissible under Illinois Rule of Evidence 804(b)(3) (eff. Jan. 1, 2011) as a statement against penal interest, sufficiently corroborated, and essential to his defense.

¶ 80    A hearsay exception applies to declarations against penal interest. *People v. Tenney*, 205 Ill. 2d 411, 433 (2002). Rule 804(b)(3) provides that a statement that tends to subject a declarant to civil or criminal liability and that is corroborated by circumstances which clearly indicate the trustworthiness of the statement is admissible. Ill. R. Evid. 804(b)(3) (eff. Jan. 1, 2011). This court, in examining Federal Rule of Evidence 804(b)(3), which is consistent with

---

[5]Perez's testimony referred to the gun as "an automatic" several times. Asked by the assistant State's Attorney, "And so you believed it was a semi-automatic pistol, correct?" Perez answered, "Yes, I do believe that."

our rule, identified three conditions that must be satisfied before a statement will be admitted under the rule: "(1) the declarant must be unavailable, (2) the declarant's statement must have been against his or her penal interest, and (3) corroborating circumstances must support the trustworthiness of the statement." *People v. Rice*, 166 Ill. 2d 35, 43 (1995).

¶ 81 Rule 804(a)(1) specifically provides that a witness's exercise of a privilege satisfies the requirement of unavailability. Ill. R. Evid. 804(a)(1) (eff. Jan. 1, 2011). Accordingly, a declarant who properly asserts his fifth amendment right not to testify is unavailable for purposes of the rule. *Id.*; see also *People v. Caffey*, 205 Ill. 2d 52, 101 (2001).

¶ 82 In this case, during a sidebar conference, which took place during the State's case-in-chief, defendant made an offer of proof that Detective Lee would testify that codefendant said he committed the robbery with a black BB gun. Defendant, however, acknowledged that the statement was hearsay and that he needed "the actual person" to testify. Following this sidebar, defendant resumed his cross-examination of Detective Lee. He attempted to elicit codefendant's statement, and the State objected. The trial court sustained the objection, stating that "[w]e are not going into the statement, the nature of the conversation with [codefendant]."

¶ 83 Subsequently, prior to defendant's case-in-chief, the trial court conducted a hearing with codefendant present, outside the presence of the jury. During the hearing, codefendant invoked his fifth amendment right not to testify. Consequently, we agree with defendant that codefendant was unavailable for purposes of Rule 804(b)(3), as he was not able to call him as a witness to testify regarding his statement to Detective Lee.

¶ 84 Following this invocation of his fifth amendment right not to testify, however, there is no indication that defendant attempted to call Detective Lee in order to elicit codefendant's statement. Similarly, there is no indication in the record that he requested any conference with the trial court to seek the statement's admission. The trial court was simply not asked to make any further rulings on its admissibility. We recognize that his failure to pursue this evidence may have occurred because defendant was not represented by counsel. Nevertheless, as the trial court admonished him before trial, if he proceeded *pro se*, he is to be held to the same standards as an attorney and cannot complain on appeal of his own lack of competency. We conclude that the trial court did not err by not admitting codefendant's statement to Detective Lee because defendant did not seek its admission after codefendant invoked his fifth amendment right not to testify.

¶ 85 *Jury Instruction*

¶ 86 Finally, defendant asks this court to consider whether the trial court erred by not *sua sponte* instructing the jury on the definition of "firearm" and that a BB gun is excluded from the definition. Defendant concedes that he forfeited this issue by not raising it in a posttrial motion but asks that we review it for plain error.

¶ 87 We find no plain error because no error occurred. *People v. Thompson*, 238 Ill. 2d 598, 613 (2010) ("The first step of plain-error review is determining whether any error occurred.").

¶ 88 "It is the burden of the party who desires a specific instruction to present it to the court and request that it be given to the jury." *People v. Turner*, 128 Ill. 2d 540, 562 (1989); Ill. S. Ct. R. 366(b)(2)(i) (eff. Feb. 1, 1994). Defendant did not tender the desired instruction but argues that the trial court should have *sua sponte* provided the jury with an instruction defining firearm. "Generally, the only situations where a fair trial requires the court to *sua sponte* offer an

instruction include seeing that the jury is instructed on the elements of the crime charged, on the presumption of innocence and on the question of burden of proof." (Internal quotation marks omitted.) *Turner*, 128 Ill. 2d at 562-63. Defendant asserts that, because evidence was presented that the crime could have been committed with a BB gun, it was critical that the trial court provide the jury with such an instruction on its own.[6]

¶ 89 We disagree and emphasize that defendant's position is contrary to the one he took at trial. At the jury instruction conference, defendant objected to instructing the jury that he could be found guilty of the lesser offense of robbery. The court explained that the instruction was being given, over his objection, because he "introduced evidence of a gun and then argued that it was a BB gun." Thereafter, defendant consistently objected to providing the jury a verdict form for robbery and argued that he did not know codefendant and was not accountable for anything that he did. During closing argument, defendant only briefly mentioned the gun when he stated, "I showed you all some pictures of what looks to be a gun. You heard testimony that the date of this crime that it was snow [*sic*] outside. This gun was found in the direction of travel that the police say these two suspects ran." Defendant then argued his theory to the jury that he was innocently driving his van when he was stopped by police, that two other individuals committed this crime, and that he was not guilty of any charges. He never argued, in the alternative, that at most he was guilty only of robbery because codefendant was not armed with a firearm during the offense. The State, however, informed the jury during its closing argument that if they believed the gun recovered by police was a BB gun, rather than a "real firearm," they could find defendant guilty of the lesser offense of robbery. Despite this option, the jury returned a verdict finding defendant guilty of armed robbery.

¶ 90 For these reasons, we reject defendant's claim that the trial court erred in failing to *sua sponte* provide a jury instruction defining the term "firearm."

¶ 91                                        CONCLUSION

¶ 92 Accordingly, the judgment of the appellate court is affirmed in part and reversed in part. The judgment of the circuit court is affirmed.

¶ 93 Appellate court judgment affirmed in part and reversed in part.

¶ 94 Circuit court judgment affirmed.

---

[6]Effective January 24, 2014, the Illinois Pattern Jury Instructions were amended and reflect the current version of the armed robbery statute (Illinois Pattern Jury Instructions, Criminal, Nos. 14.05 and 14.06 (approved Jan. 24, 2014) (hereinafter IPI Criminal Nos. 14.05 and 14.06)). The committee notes to IPI Criminal Nos. 14.05 and 14.06 do not require that a definition for "firearm" be given when the offense involves a firearm. There is a pattern instruction, however, defining "firearm" pursuant to section 1.1 of the FOID Act (430 ILCS 65/1.1 (West 2010)). See IPI Criminal No. 18.35G.