# Illinois Official Reports

## Appellate Court

***People v. Little*, 2018 IL App (1st) 151954**

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v JERMON LITTLE, Defendant-Appellant. |
| District & No. | First District, Third Division<br>Docket No. 1-15-1954 |
| Filed | September 28, 2018 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 12-C6-60111; the Hon. Brian Flaherty, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | Michael J. Pelletier, Patricia Mysza, and Michael Gentithes, of State Appellate Defender's Office, of Chicago, for appellant.<br><br>Kimberly M. Foxx, State's Attorney, of Chicago (Alan J. Spellberg, Joseph Alexander, and Elliot Englander, Assistant State's Attorneys, of counsel), for the People. |
| Panel | JUSTICE ELLIS delivered the judgment of the court, with opinion. Presiding Justice Fitzgerald Smith and Justice Howse concurred in the judgment and opinion. |

# OPINION

¶ 1 Defendant, Jermon Little, was convicted after a bench trial of aggravated battery of a peace officer (720 ILCS 5/12-3.05(d)(4) (West 2012)) and criminal damage to government-supported property (*id.* § 21-1.01). On appeal, he challenges the sufficiency of the evidence to sustain these convictions. And he contends that the trial court's premature finding of guilt, announced before counsel was permitted to argue the case, denied him his constitutional right to make a closing argument.

¶ 2 But this case has an uncommon (albeit not unique) twist: The trial court acknowledged its inadvertent error, reopened the case after judgment, and promised to "keep an open mind" while hearing counsel's (admittedly belated) argument. In the end, the trial court stood by its initial conclusion—that the three police officers who testified for the State were more credible than defendant and two relatives who testified on his behalf—and reaffirmed its findings of guilt.

¶ 3 The question thus presented is whether—and if so, under what circumstances—reopening a bench trial after a premature judgment preserves a defendant's constitutional right to make a closing argument. We hold that reopening the case preserves this right, unless the record shows that the trial judge was unable or unwilling to give defense counsel's belated argument all due consideration before finalizing its judgment(s) of guilt.

¶ 4 The record here reveals quite the opposite. And the trial court could reasonably find that the testifying officers were more credible than defendant and his witnesses. We therefore affirm defendant's convictions.

## BACKGROUND

¶ 5

¶ 6 The charges in this case arose from a confrontation between defendant and three officers of the Burnham Police Department, on January 8, 2012, in the parking lot of a sports bar. The details of that confrontation were thoroughly disputed at trial. Chief Peter Belos and Officers Bolin and Russell testified to one version of events for the State. Defendant, his sister, and his niece testified to another.

¶ 7 Around 2 a.m., Chief Belos drove through the parking lot of the bar while on routine patrol. He testified that he saw defendant and a woman walking through the lot, having a "heated argument" and a "pushing and shoving match." He called for backup and parked his car. As he approached defendant and the woman on foot, he identified himself and asked what they were arguing about. Defendant separated himself from the shoving match and walked toward the front door of the bar.

¶ 8 Chief Belos followed defendant to the door and ordered him to remove his left hand from underneath his coat, fearing that he may have been holding a gun. Defendant refused and walked back to the center of the parking lot. Chief Belos followed him and repeated his order five or six times. Defendant refused to comply, so Chief Belos eventually grabbed his arm. Defendant broke free and ran back toward the front door of the bar.

¶ 9 Chief Belos followed defendant back to the door, where defendant eventually removed his hand from underneath his coat. He was holding an open beer bottle. Chief Belos asked him what the argument was about. Defendant erupted in profanity and tried to walk away again.

¶ 10     In the meantime, a crowd of people had gathered around. Chief Belos asked defendant to step over to his vehicle, away from the crowd, to talk about the argument. Instead, defendant hit Chief Belos in his left shoulder. At that very moment, Officers Bolin and Russell were arriving.

¶ 11     Officers Bolin and Russell testified that that they arrived at the same time but in separate cars. They both parked at the edge of the lot and approached, on foot, a crowd that included defendant, Chief Belos, and 8 to 12 other people surrounding them. Defendant was wrangling with Chief Belos. Officer Bolin testified that Chief Belos was holding defendant by the arm or jacket, but defendant pulled away and pushed Chief Belos. Officer Russell testified that he saw Chief Belos "fall back," but he could not be sure, from his vantage point, if Chief Belos was pushed in the arm or punched in the mouth.

¶ 12     As they approached, Officers Bolin and Russell identified themselves, and Chief Belos instructed them to arrest defendant. They tried, but defendant resisted. He was combative, drunk, and shouting defiant profanities at the officers. While Officers Bolin and Russell struggled with defendant, Chief Belos turned his attention to the rest of the crowd, which had grown loud and unruly, and called for additional backup.

¶ 13     Officer Bolin grabbed defendant's arm, but he pulled away and started to run. Officer Bolin caught up with defendant, grabbed him from behind, and tried to cuff him. By this time, they were near a storefront window in the strip mall where the bar was located. Defendant lunged backward forcefully, ramming Officer Bolin's back into the plate-glass window. The window cracked but did not fully break. Defendant then fell to the ground, face-forward, and Officer Bolin fell on top of or next to him. Officer Bolin tried again to cuff him, but defendant kept kicking, punching, and pulling away. At least one of defendant's kicks landed, striking Officer Bolin in the shin.

¶ 14     Officer Russell warned defendant that he would be tased if he kept resisting. Defendant continued resisting, so Officer Russell gave him a "drive stun" to the arm. (That is, he held his taser to defendant but did not put the prongs into him—a method, he testified, that delivers a lower-level jolt.) Apart from that, Officer Russell testified, he never struck defendant in any way.

¶ 15     Officer Bolin testified that the rest of the crowd was "beating on" him and Officer Russell the whole time, hitting them from behind while they tried to subdue defendant.

¶ 16     After defendant was tased, Officer Bolin handcuffed him, put him in the back of his squad car, and drove him to the station. According to Officer Bolin, defendant kicked out the rear passenger-side window of the car. Chief Belos testified that when he saw Officer Bolin's car at the station, one of the rear windows was broken and the frame around the window was bent; earlier in the evening, when he saw Officer Bolin on patrol, the window was intact.

¶ 17     Officer Bolin testified that he did not notice any injuries to defendant at the station.

¶ 18     Defendant, his niece Kandis McMiller, and his sister Tasheena Givens testified to a very different version of events.

¶ 19     Defendant and his family had gathered at the bar to celebrate his niece Lanique's birthday. Givens was escorted out of the bar by security guards after lighting a cigarette inside. McMiller and defendant went outside to talk to her. Defendant testified that McMiller left them at some point, but he was still talking to Givens when the police arrived. He testified that "I guess we were loud because I'm telling her to calm down."

¶ 20    Twenty or more other people, according to the defense witnesses, had also gathered in the parking lot by the time the police arrived. McMiller testified that the scene was peaceful and that nobody was arguing. Givens testified that there was a "confrontation" brewing in another "group of girls" in the lot, and that the "whole lot was lit up like fireworks with noise."

¶ 21    The defense witnesses estimated that upwards of a dozen police cars descended upon the lot. One of the officers drove past Givens and defendant, with his window rolled down, and said "come here." They walked away because they didn't think the officer was talking to them. The officer got out of his car, walked over, and said, "You heard me talking to you."

¶ 22    Without any warning, that officer—whom defendant identified as Officer Russell—hit defendant in the face with his baton. The defense witnesses all denied that defendant said anything to Officer Russell or made any contact with him before he hit defendant. Defendant either fell to his knees or was thrown to the ground by Officer Russell. He was bleeding heavily from his mouth.

¶ 23    While defendant was on the ground, Officer Russell handcuffed and tased him several times in the back. Officer Russell then pulled defendant back up and tased him again, this time in his chest, while walking him to the squad car. Whenever defendant was tased, he foamed from his mouth, and his eyes rolled back in his head.

¶ 24    Givens and McMiller testified that the police also tased and arrested several other family members, including Givens. According to Givens, the police "just went berserk on people."

¶ 25    Defendant denied that he touched or said anything to Officer Russell. He denied pushing Officer Bolin into the storefront window or breaking the window of the squad car. He testified that he never had his hand underneath his coat, and that nobody ever told him to remove his hand from his coat.

¶ 26    Defendant introduced into evidence four photos depicting the injuries allegedly inflicted by Officer Russell. Three of those photos, defendant's Exhibits 1 through 3 (all dated January 11, 2012, three days after the incident), depict swelling on his face and lip. Exhibit 4 (dated January 18, 2012, 10 days after the incident), he claims, depicts the area on his chest where he was tased. Defendant did not offer any photos of the areas on his back where allegedly he was tased.

¶ 27    After the defense rested, the trial court continued the case, so the judge could review his notes and the trial transcripts. The court did not hear closing arguments at that time.

¶ 28    When the case was eventually recalled on December 12, 2014 (nearly three months after the close of evidence), the trial court immediately announced its findings. The court found that the case boiled down to a credibility contest, that the officers testified credibly, and that defendant's relatives "had a motive not to be truthful" on the stand.

¶ 29    The trial court found defendant guilty of several counts of aggravated battery of a peace officer. The counts were all based on making physical contact of an insulting or provoking nature with Chief Belos or Officer Bolin; defendant was acquitted of the counts charging him with causing bodily harm to the officers. The trial court also found defendant guilty of one count of criminal damage to government-supported property.

¶ 30    As soon as the court announced its findings, defense counsel pointed out that the court had not heard closing arguments. After some discussion, the court conceded its error and offered counsel a chance to argue, promising "that I will keep an open mind." Counsel then made his

argument, which focused on the failure of the bar's security guards to testify. The State waived both its closing argument and rebuttal.

¶ 31   The trial court reiterated its findings of guilt after hearing counsel's belated argument. As the judge explained, "I spent probably—probably six or seven hours going over this case in my mind, again reviewing everything that I have, and my opinion does not change after your closing argument." The judge apologized to counsel for not letting him argue the case first, but added, again, that "nothing that you said, [counsel], would have changed my mind."

¶ 32   The trial court merged the various counts of aggravated battery to a peace officer into two (one for each victim), and sentenced defendant—who had no prior felony convictions and was gainfully employed—to two years' probation.

¶ 33                                              ANALYSIS

¶ 34                                                   I

¶ 35   Defendant first challenges the sufficiency of the evidence to sustain his convictions for aggravated battery of a peace officer and criminal damage to government-supported property.

¶ 36   In reviewing the sufficiency of the evidence, we ask whether a rational trier of fact, viewing the evidence in the light most favorable to the State, could have found the essential elements of the crime beyond a reasonable doubt. *People v. Wright*, 2017 IL 119561, ¶ 70; *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). In applying this standard, we draw all reasonable inferences in favor of the State. *People v. Beauchamp*, 241 Ill. 2d 1, 8 (2011). And we afford great deference to the trial court's findings on witness credibility, the weight to be given certain testimony, the balancing of conflicting evidence, and the reasonable inferences to be drawn from the evidence. *Wright*, 2017 IL 119561, ¶ 70. Those findings, however, are not conclusive and may be reversed on appeal if "the record evidence compels the conclusion that no reasonable person could accept" them. *People v. Cunningham*, 212 Ill. 2d 274, 280 (2004).

¶ 37   A person commits aggravated battery of a peace officer when he commits a battery, other than by discharge of a firearm, against a victim he knows to be a peace officer performing his or her official duties. 720 ILCS 5/12-3.05(d)(4)(i) (West 2012). As relevant here, a person commits a battery when he intentionally or knowingly, and without legal justification, makes physical contact of an insulting or provoking nature with an individual. *Id.* § 12-3.

¶ 38   Defendant does not dispute that he knew Chief Belos and Officer Bolin were police officers performing their official duties. (Defendant was not charged with aggravated battery to Officer Russell.) Thus, the only question is whether the State proved beyond a reasonable doubt that defendant made "physical contact of an insulting or provoking nature" with either of them.

¶ 39   The evidence, taken in the light most favorable to the State, was sufficient to prove that he did. Chief Belos was trying to conduct a field interview of defendant. Standing near the bar entrance, surrounded by a growing crowd, he asked defendant to walk with him to his car, away from the crowd, to discuss the earlier quarrel that he had observed. Instead of cooperating with Chief Belos, defendant hit him.

¶ 40   All three officers testified to that allegation. Chief Belos testified that defendant hit him in his left shoulder with his hand. Officer Bolin's testimony that he saw defendant "push" Chief Belos is consistent, in essentials, with Chief Belos's own. And Officer Russell similarly testified that he saw Chief Belos "fall back" after being struck, but he was not sure whether Chief Belos was struck in the arm or the mouth. Any variations in the officers' accounts,

perhaps owing to their respective vantage points, were incidental; and they certainly did not render the officers' testimony "illogical and inconsistent," to the point of "strain[ing] credulity," as defendant claims. A rational trier of fact could have found that defendant hit Chief Belos, and thus committed an aggravated battery.

¶ 41 At Chief Belos's command, Officer Bolin (along with Officer Russell) tried to arrest defendant. After defendant initially slipped away, Officer Bolin caught up to him, grabbed him from behind, and tried to cuff him. Officers Bolin and Russell testified that defendant lunged backward, pushing Officer Bolin's back into a storefront window. They both fell to the ground after the impact, and Officer Bolin again tried to cuff defendant. But defendant continued to resist, throwing kicks and punches at Officer Bolin. And at least one of those kicks, according to Officer Bolin, hit him in the shin. A reasonable trier of fact could credit this testimony and thus find that defendant committed an aggravated battery against Officer Bolin.

¶ 42 As defendant acknowledges, his trial was a credibility contest. The trial court heard testimony from three police officers, who testified that a drunk and unruly defendant resisted their efforts to subdue him, making the prohibited physical contact with two officers in the process. The trial court also heard "diametrically opposed" testimony from defendant and two of his relatives, who testified that a swarm of police officers descended upon the bar's parking lot and "just went berserk on people," including defendant, for no particularly obvious reason. And the trial court found the officers more credible.

¶ 43 That should be the end of the matter. We do not reweigh the evidence on appeal, and unless they are clearly irrational, we honor the trial court's determinations about the relative credibility of the witnesses. *Wright*, 2017 IL 119561, ¶ 70. Defendant nevertheless argues that we should find the State's evidence insufficient because it consisted entirely of "dubious" officer testimony that "conflicted with" three "reliable" defense witnesses. To this end, he offers two principal reasons why any rational trier of fact should reject the officers' testimony as objectively implausible. Neither reason is convincing.

¶ 44 First, defendant says it would "defy logic" to believe that Officers Bolin and Russell could have responded to the call for backup in time to see defendant hit Chief Belos, because this would have required them to arrive in a matter of "seconds."

¶ 45 On direct examination, Chief Belos estimated that from the time he first saw defendant in the parking lot and called for backup, until the time defendant hit him (or more precisely, until the time defendant revealed the beer bottle under his coat, which was immediately before defendant hit him), only about "a minute" had passed—hardly enough time, defendant says, for Officers Bolin and Russell to respond to the scene. The defense's account of events, in contrast, does not require this implausible, if not impossible, feat.

¶ 46 Defendant also claims that Chief Belos revised his testimony about when he called for backup on cross-examination. That is not evident to us, but in any event, it does not change the crux of defendant's argument, which is that Officers Bolin and Russell had no more than about a minute, or as defendant says, "mere seconds," to get to the bar.

¶ 47 The trial court could have reasonably thought that Chief Belos (and the other officers) testified truthfully about defendant's conduct, but that his estimate of the elapsed time was not entirely accurate. Chief Belos testified that defendant repeatedly refused to remove his hand from underneath his coat, and so he feared that defendant may have been concealing a gun. We would not expect an officer to be taking careful note of the precise time as he followed an

uncooperative and potentially armed individual back and forth through a parking lot in the middle of the night.

¶ 48    The trial court could have taken Chief Belos's testimony less literally than defendant does, as saying merely that the incident unfolded quickly. Indeed, that is what Chief Belos said on cross-examination: "I didn't have a stopwatch. I didn't time the whole incident, but it happened very fast." But then defendant's argument is merely that Officers Bolin and Russell could not have responded within some unspecified but short period of time—as if they *could not* have been close by when the call for backup came in. It was not unreasonable for the trial court to reject that vague and speculative inference.

¶ 49    Defendant also says that the officers' testimony is belied by the photographic evidence of his alleged injuries. Specifically, three of the photos, defendant's Exhibits 1 through 3, depict swelling and bruising on the left side of his face and upper lip. Thus, defendant argues, they refute Officer Russell's denial that he hit defendant in the face with his baton, and, in turn, support the defense witnesses' testimony that he did.

¶ 50    The photos may be *consistent* with the defense witnesses' testimony, but they do not *refute* the officers' competing account of their struggle to detain defendant. The officers testified that after defendant lunged backward, pushing Officer Bolin's back into the storefront window, he fell face-forward to the ground, where he continued to struggle and forcefully resist Officer Bolin's attempts to handcuff him—so much so that Officer Russell had to subdue him with a taser. It is entirely possible that defendant bruised his face and lip in the course of his face-forward fall and ensuing on-the-ground tussle with Officer Bolin. Thus, the photos do not show that it was irrational for the trial court to credit the officers over the defense witnesses.

¶ 51    The rest of defendant's arguments merit little or no discussion. For example, he says it is "unlikely" that a "38-year-old with no prior felony convictions suddenly became so belligerent" that he attacked two police officers and could not be restrained without the use of a taser. Defendant's criminal history was not in evidence at trial. And even if it had been, defendant's argument would merely invite us to reweigh that evidence and the credibility of the witnesses for ourselves. These are not legitimate grounds for reversal under the *Jackson* standard.

¶ 52    In sum, because the trial court could reasonably credit the officers' testimony, the State's evidence was sufficient to prove defendant guilty of aggravated battery to a peace officer.

¶ 53    Next, a person commits criminal damage to government-supported property when he or she knowingly damages any property that is supported (in whole or in part) with state funds, without the consent of the state. 720 ILCS 5/21-1.01(a)(1), (b) (West 2012). The only element in dispute here is whether defendant actually damaged Officer Bolin's squad car.

¶ 54    The evidence, taken in the light most favorable to the State, was sufficient to prove that he did. Officer Bolin testified that defendant kicked out the rear passenger-side window of his squad car while en route to the station. The testimony of a single witness is sufficient to convict, as long as it is "positive and credible," and even though it is contradicted by the defendant's own testimony. *People v. Siguenza-Brito*, 235 Ill. 2d 213, 228 (2009).

¶ 55    And although Chief Belos did not see this alleged incident, he testified that when he saw Officer Bolin's car at the station, one of the rear windows was broken, and the window frame was bent. When Chief Belos saw Officer Bolin's car earlier that evening, before the incident at the bar, the window and frame were intact. His testimony thus supports Officer Bolin's.

¶ 56 It is true, as defendant says, that the State did not introduce any photos of the squad-car window (or other documentary evidence) to corroborate the officers' testimony. But if believed, their testimony was sufficient on its own. See *id.* The absence of any photos merely goes to the officers' credibility and the weight their testimony on this point deserves. The trial court resolved those questions in favor of the officers, and those determinations are entitled to significant deference on appeal. *Wright*, 2017 IL 119561, ¶ 70.

¶ 57 There was nothing so inherently implausible about Officer Bolin's testimony that no rational trier of fact could believe it. Indeed, defendant's only argument to the contrary is that Officer Bolin did not testify credibly about defendant's conduct in the parking lot, and thus his testimony about defendant's conduct in the car deserves no credence either. This argument fails for the reasons we have already given. The evidence was sufficient to convict defendant of criminal damage to government-supported property.

¶ 58                                                                                II

¶ 59 Defendant next contends that he was denied his right to make a closing argument when the trial court prematurely announced its findings of guilt.

¶ 60 The sixth amendment guarantees every defendant the right to make a closing argument, whether he elects a jury or a bench trial, and no matter how "simple, clear, unimpeached, and conclusive the evidence may seem." (Internal quotation marks omitted.) *Herring v. New York*, 422 U.S. 853, 856-57, 860 (1975). When this right is completely denied, "[t]here is no way to know" what arguments in summation might have affected the outcome of the case. *Id.* at 864. Thus, although *Herring* did not say so explicitly, courts have universally read that decision to require automatic reversal when defense counsel is not permitted to argue the case. See, *e.g.*, *People v. Millsap*, 189 Ill. 2d 155, 166 (2000); *People v. Stevens*, 338 Ill. App. 3d 806, 810 (2003).

¶ 61 But that is not—or not exactly—what happened here. After the close of evidence, the trial court continued the case without hearing closing arguments. The court wanted time to review its notes and the transcripts first. When the case was eventually recalled (nearly three months later), the trial court immediately announced its findings—that the officers were more credible than the defense witnesses, and thus that defendant was guilty of at least several of the charged counts.

¶ 62 Defense counsel immediately, if sheepishly, asked, "[d]id we ever argue this case?" The trial court initially said yes, but soon conceded its error. When counsel then asked, "Do you think argument is gonna change your mind?" the court answered, "I have no idea," but assured counsel "that I will keep an open mind."

¶ 63 Counsel made his closing argument without interruption, focusing on the role of the bar's security guards and their failure to testify. When counsel finished summing up, the trial court reiterated its findings of guilt.

¶ 64 As the judge explained to counsel, he had spent several hours reviewing his notes and the transcripts, and "my opinion does not change after your closing argument." The judge apologized for announcing his findings prematurely, but added, again, that "nothing that you said, [counsel], would have changed my mind."

¶ 65 In light of this record, defendant's description of the issue in his opening brief is (at best) incomplete. The trial court did not deny defense counsel an opportunity to make a closing

argument, full stop. The crux of the issue is that the trial court had to reopen the case, after a premature judgment, to hear counsel's argument. So the question we must answer is whether— and if so, under what circumstances—this remedy adequately protects a defendant's sixth amendment right to make a closing argument and, as a corollary, his due-process right to a fair and open-minded trier of fact.

¶ 66    Neither party cites a single case that addresses these questions head-on. But our own research has revealed several, and they reach conflicting conclusions about the questions at hand.

¶ 67    There is one Illinois case directly on point. In *People v. Daniels*, 51 Ill. App. 3d 545, 548 (1977), the trial court found Daniels guilty without first hearing closing argument. The error was clearly inadvertent, as the court "immediately and without question permitted summation" when defense counsel requested it. *Id.* Although counsel's summation was belated, coming after the judgment was prematurely announced, we found that there was "no violation of the principle set forth in the *Herring* case." *Id.*

¶ 68    We do not read *Daniels* as adopting a bright-line rule that reopening a case for argument is *always* an adequate remedy for a premature judgment. The opinion offers little detail about the trial court's actual remarks, but our description of the court as allowing argument "without question" suggests that the court appeared willing to hear counsel's argument with an open mind and that we found the trial court's attitude, as expressed on the record, to be the dispositive fact in affirming its judgment. See *id.*

¶ 69    The Tenth Circuit adopted that rule explicitly in *United States v. Price*, 795 F.2d 61 (10th Cir. 1986). The federal court of appeals "accept[ed] the view that a trial judge, under these circumstances[, *i.e.*, hearing argument after a premature judgment], is *capable* of keeping an open mind." (Emphasis added.) *Id.* at 64. The question for a reviewing court is whether the record shows that the trial judge was *willing* to do so. See *id.*

¶ 70    In *Price*, there was "neither an explicit statement nor an implicit suggestion that Mr. Price's closing argument did not receive open-minded consideration." *Id.* Rather, the record showed that the trial court's error was "inadvertent[ ]" and did not "manifest an unwillingness to hear Mr. Price's closing argument" fairly. *Id.* Because defense counsel "was permitted to make his closing argument to an attentive, open-minder trier of fact," the court affirmed Price's conviction. *Id.*

¶ 71    Consider, by way of contrast, the trial courts' remarks in *United States v. King*, 650 F.2d 534 (4th Cir. 1981), and *United States v. Walls*, 443 F.2d 1220, 1223 (6th Cir. 1971). Both courts reopened their respective cases for closing argument after prematurely announcing judgment; but in doing so, each trial court said unequivocally that a belated argument would be futile because the court had already made up its mind and was not amenable to changing it. *King*, 650 F.2d at 536 (judge stated that " 'I have already made my finding. It's not going to change anything,' " and told counsel, " 'If you want to argue the case for the record, for the appeals, that's fine as far as I'm concerned.' "); *Walls*, 443 F.2d at 1223 (judge said "argument then would be futile because he had made up his mind").

¶ 72    Both King and Walls were granted new trials on appeal. The Sixth Circuit held (in a pre-*Herring* case) that Walls was effectively denied his right to make a closing argument: A futile argument—made to a fact-finder decidedly unwilling to change its mind, no matter what counsel might have to say—is not the closing argument the constitution guarantees. See *Walls*, 443 F.2d at 1223-24.

- 9 -

¶ 73    And in *King*, 650 F.2d at 537, where counsel declined to argue after the judge said, in no uncertain terms, that argument would be pointless, the Fourth Circuit held that counsel did not make a tactical decision to waive argument. Rather, counsel never had a chance to argue the case in "the kind of environment in which a defendant's interests can be effectively advocated," and therefore was denied "any real opportunity" to argue on behalf of his client at all. *Id.* at 536-37.

¶ 74    We glean the following rule from these cases: Reopening a case for closing argument is an adequate remedy for a premature judgment when the record shows that the judge was willing to hear the defense's argument with an open mind—that is, where the judge acknowledges (or at least does not overtly reject) the possibility that counsel's argument could still change the judge's mind about the outcome of the case. But if the record shows that the judge was *un*willing to keep an open mind, or expressed the view that he simply could not, then the only remedy that would protect the defendant's constitutional rights would be a new trial before a different judge.

¶ 75    It is no objection that *Herring*, 422 U.S. at 864, requires automatic reversal, whereas this rule does not. The Court adopted an automatic-reversal rule in *Herring* because it thought "[t]here is no way to know" for sure what arguments might have persuaded the trier of fact when counsel was denied any chance to make them. See *id.* That rationale does not apply where counsel *did* have an opportunity to marshal the defense's best arguments in a (admittedly belated) summation. If automatic reversal is to be required in *this* context, the rule will have to be justified by different considerations than those offered in *Herring*.

¶ 76    An automatic-reversal rule in this context is not completely without authority. In *Spence v. State*, 463 A.2d 808 (Md. 1983), for example, the Court of Appeals of Maryland (that state's highest court) adopted such a rule. In sharp contrast to *Price*, 795 F.2d at 64, the *Spence* court rejected the view that a judge *can* keep an open mind after prematurely announcing judgment. It would be unrealistic to expect the judge to recover the same attitude of open-mindedness, and to "create the same atmosphere of fairness," that existed before the entry of judgment. *Spence*, 463 A.2d at 811-12. The judge's good intentions notwithstanding, a fair hearing is no longer possible: " 'The bell having rung cannot be unrung.' " *Id.* at 811 (quoting *People v. Dougherty*, 162 Cal. Rptr. 277, 280 (Ct. App. 1980) (ordered deleted from California Appellate Reports)).

¶ 77    Defendant echoes this metaphor in his reply brief, where he asserts that the trial court "could not unring the bell of premature judgment." At that point, says defendant, "confirmation bias"—the human tendency to seek out data compatible with one's beliefs, while ignoring contrary evidence—prevented the trial court from giving fair consideration to any defense arguments that cut against the conclusions it had already reached.

¶ 78    We do not deny that human beings may be subject to confirmation bias. And we are mindful that a defendant's right to an unbiased and open-minded trier of fact is of paramount importance. But we reject the conclusion that defendant, and the court in *Spence*, draw from these principles: That once the trier of fact has reached a conclusion about the case, closing argument is necessarily futile because the trier of fact can no longer hear and consider the argument fairly.

¶ 79    The Supreme Court rejected (one version of) this conclusion in *Herring*: "[S]urely, there will be cases where closing argument may *correct a premature misjudgment* and avoid an otherwise erroneous verdict." (Emphasis added.) 422 U.S. at 863.

¶ 80    Granted, the Court was not referring to a judgment that had been *announced* prematurely, or a closing argument made after that announcement. Rather, the Court's point was that closing argument, no matter how "open and shut" the case seemed "at the close of evidence," might still change the conclusion that the trier of fact had already reached at *that* stage of the trial. *Id.*

¶ 81    Despite this difference (which we will discuss later), the Court's point in *Herring* merits careful scrutiny. It has important implications for the question presented in this case because it helps to clarify what a defendant's right to an open-minded trier of fact can realistically mean.

¶ 82    A trier of fact should strive to suspend judgment, as best it can, until the end of the trial. But that is possible only to a point. Judges and jurors inevitably form beliefs about the evidence presented to them as the case unfolds. For instance, a belief that a witness is telling the truth—or not—will sometimes impress itself upon the trier of fact in real time, as it observes the witness on the stand. And when the evidence as a whole strikes the trier of fact as simple and decisive enough—if, for example, the case turns on the testimony of a witness whose credibility seems immediately apparent—the verdict, unavoidably, will also seem clear to the trier of fact long before closing argument, as *Herring* frankly acknowledged. See *id.*

¶ 83    But even in these circumstances, *Herring* tells us, closing argument may still change the trier of fact's mind. *Id.* No matter how "simple" or "open and shut" the case may seem, it is always possible that the trier of fact has missed something—a doubt about a witness, a gap in the State's proof, some connection between various evidentiary facts—and so has misjudged the case prematurely. See *id.* And it is always possible that counsel, marshalling the evidence "from the point of view most favorable to" the defendant, will bring that error to light, and thus "correct" the trier of fact's "misjudgment," in closing argument. *Id.* at 864; see also *People v. Crawford*, 343 Ill. App. 3d 1050, 1059 (2003) ("It is not uncommon for a trial court to change its initial impression following argument by defense counsel or the prosecutor.").

¶ 84    The Court's faith in the power of an advocate's argument to sway the verdict even in these seemingly futile circumstances—where the trier of fact, confident the case was an easy one, has already reached its conclusion—is an essential part of why *Herring* deemed the right to closing argument fundamental. But we could not make sense of this holding if we accepted a key premise of defendant's argument—that we cannot reasonably expect closing argument to change the trier of fact's mind, once it has come to a conclusion about the defendant's guilt. *Herring* tells us that the trier of fact could change its mind.

¶ 85    It is not wrong, but it *is* overly simplistic, to insist that a fair and open-minded trier of fact is one that " 'hears before it decides.' " *Spence*, 463 A.2d at 811 (quoting *People v. Diaz*, 1 Ill. App. 3d 988, 992 (1971)). We need not—because *Herring* does not—indulge the fantasy that a trier of fact will suspend all judgment until the last word is uttered in rebuttal argument. Instead, the fair and open-minded trier of fact to which every defendant is entitled is one that—while striving to suspend judgment, as best it can—is open to revising the views it does reach along the way. It is a trier of fact that remains open, at all times, to the possibility that its impressions and beliefs thus far may ultimately be wrong, upon further evidence, argument, or reflection. It is a trier of fact that listens attentively and patiently, until the very end, for any evidence or argument that might sway its verdict.

¶ 86    But what about a case like this one—where the trial court took the next step and actually *announced* its judgment before hearing closing argument? Can a judge, in these circumstances,

- 11 -

still hear a belated argument with an open mind? Or is it too late, at that point, for argument to be anything but futile?

¶ 87 That next step is not a trivial one. Reversing the order of argument and verdict is not a merely formalistic error. The verdict is obviously meant to have a finality that any previous impressions or beliefs about the evidence lacked. But we think it goes too far to say that a judge who has committed this error at a bench trial is necessarily incapable of giving full and fair consideration to a belated defense argument or of being persuaded, when the argument is compelling, that his or her view of the evidence was wrong.

¶ 88 We are not convinced that a premature bench-trial verdict is, as it were, a "bell" that can never be "unrung." That metaphor may be apt enough when, for example, a trier of fact is asked to disregard prejudicial evidence. Perhaps the clearest case is propensity evidence— evidence that is inadmissible despite being relevant. See, *e.g.*, *People v. Donoho*, 204 Ill. 2d 159, 170 (2003) (propensity evidence "not considered irrelevant"; rather, it has "too much probative value" (internal quotation marks omitted)). Because such evidence *is* relevant, a rational person ordinarily would *want* to consider it when trying to get at the truth. For, and for that reason, such evidence, once heard, may simply be too difficult to ignore (even if the law has its reasons for asking the trier of fact to do so).

¶ 89 But a judge who is asked to consider a belated argument is not being asked to disregard relevant evidence. The judge is simply being asked to hear an argument with an open mind and give it whatever consideration it deserves. True, the argument will be at odds with the judge's conclusion(s) about the evidence. But *Herring* acknowledged that the verdict will sometimes strike the trier of fact as a *fait accompli* by the close of evidence anyway and that, even in these circumstances, an advocate's closing argument may still convince the trier of fact to change its mind. 422 U.S. at 863-64. Defendant's burden is to explain why a trial judge's ability to keep an open mind—in the sense we have explained—ends, irrevocably, when a judgment is announced prematurely. The metaphor of "unringing the bell," in this context, explains nothing.

¶ 90 Defendant's cursory mention of "confirmation bias" does not fare much better. This bias is *always* with us. It influences every trier of fact's view of the evidence as the trial unfolds. We cannot pretend otherwise without embracing the very fiction that *Herring* rejected. We hope that every trier of fact will fight against this bias, and strive—against its own human tendencies—to consider new evidence and arguments fairly, no matter how clear the verdict may seem in light of the evidence already presented. Indeed, that is just what we mean by being open-minded, and no doubt some triers of fact will succeed more than others.

¶ 91 Does a trial court's confirmation bias strengthen when the court formally announces its verdict? Perhaps. But we cannot honestly claim to know. Neither can defendant. Even less can he claim to know that the bias becomes decisive at that point, leaving the judge unable to consider a belated argument with a fair and open mind.

¶ 92 Defendant's cursory citation to the work of Professor Kahneman on confirmation bias (see Daniel Kahneman, Thinking, Fast and Slow (2011)) falls far short of showing that such a blanket presumption of bias is warranted. Most courts to consider the question—including this one—have rejected any such presumption. And it is at odds with the underpinnings of *Herring*, the very source of the automatic-reversal rule that defendant asks us to extend to the case at hand.

- 12 -

¶ 93 We have not been given any clear reason to adopt that blanket presumption. And without it, there is no basis for applying a bright-line rule of reversal when a trial court reopens a bench trial, after a premature judgment, to hear closing argument. We adhere to our holding in *Daniels*, 51 Ill. App. 3d 545, as we have elaborated it here.

¶ 94 To recap: Reopening a case for closing argument is an adequate remedy for a premature judgment at a bench trial when the record shows that the judge was willing to hear the defense's argument with an open mind. But if the record shows that the judge was *not* willing to keep an open mind or expressed the view that he or she could not, then the defendant is entitled to a new trial before a different judge.

¶ 95 All that remains is to apply this rule to the record before us. To begin, as in *Price*, 795 F.2d at 64, and as we suggested in *Daniels*, 51 Ill. App. 3d at 548, the record leaves no doubt that the trial court's error was inadvertent. At the close of evidence, the court expressly continued the case for "arguments." When the case was eventually recalled, the court announced its judgment prematurely; but when the parties brought that error to light, the court freely acknowledged and corrected it. The court clearly made an honest mistake in thinking, nearly three months after the close of evidence, that it had previously heard closing arguments. The trial court never intended to deprive defendant of his closing argument, and it never expressed the attitude that closing argument was in any way dispensable.

¶ 96 Nor did the trial court's comments in any way "manifest an unwillingness to hear [the defendant's] closing argument" fairly. *Price*, 795 F.2d at 64. Unlike in *King*, 650 F.2d at 536, and *Walls*, 443 F.2d at 1223, where the trial courts clearly stated that argument would be futile, the trial court here promised to "keep an open mind." The court could hardly have been clearer that it was willing to listen to counsel's argument and give it whatever consideration it deserved on the merits. Nothing in the record suggests that the court's promise was insincere, or that the trial court failed in its "obligation to be attentive, patient, and impartial" while hearing counsel's argument. *Crawford*, 343 Ill. App. 3d at 1059.

¶ 97 In its last word on the subject, after apologizing for having announced its judgment prematurely, the trial court reiterated that "nothing that you said, [counsel], would have changed my mind." Defendant isolates this remark as evidence of the court's irreparable "prejudgment" of the case. But we do not understand the trial court to be saying here that it was unwilling or unable to change its mind, even if counsel's arguments in summation proved convincing.

¶ 98 In the sentence uttered just before this one, the court had said that "my opinion does not change after your closing argument." Taking the court's remarks as a whole, and in context, we think it is clear that the two remarks were intended to mean the same thing: Not that argument was futile, because the trial court was unwilling to hear it with an open mind, but rather that the argument counsel *did* make was unconvincing. The trial court believed the officers, and the crux of counsel's argument—that the bar's security guards were not called to corroborate the officers' testimony—did not change that assessment.

¶ 99 In sum, defendant was not denied his sixth-amendment right to make a closing argument. Nor was he denied a fair trial before an open-minded trier of fact. Having reached these conclusions, we do not consider the parties' forfeiture and plain-error arguments.

¶ 100                               CONCLUSION

¶ 101        For the foregoing reasons, defendant's convictions and sentence for aggravated battery of a peace officer and criminal damage to government-supported property are affirmed.

¶ 102        Affirmed.