2021 IL App (1st) 181214-U

No. 1-18-1214

Order filed February 4, 2021

Fourth Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 17 CR 14423 |
| | ) | |
| BERNARD HIGGINS, | ) | Honorable |
| | ) | Vincent M. Gaughan, |
| Defendant-Appellant. | ) | Judge, presiding. |

PRESIDING JUSTICE GORDON delivered the judgment of the court.
Justices Lampkin and Martin concurred in the judgment.

**ORDER**

¶ 1    *Held*:  Defendant's conviction for unlawful use or possession of a weapon by a felon is affirmed over his contention the State failed to prove beyond a reasonable doubt that he possessed a firearm.

¶ 2    Following a bench trial, defendant Bernard Higgins was found guilty of unlawful use or

possession of a weapon by a felon (UUWF) (720 ILCS 5/24-1.1(a) (West 2016)) and sentenced to

28 months in prison.[1] On appeal, defendant contends that he was not proven guilty beyond a reasonable doubt when the evidence at trial failed to establish that he possessed a "firearm" as defined by section 1.1 of the Firearm Owners Identification Card (FOID) Act (see 430 ILCS 65/1.1 (West 2016)). We affirm.

¶ 3     Following his arrest, defendant was charged by information with one count of UUWF and one count of aggravated unlawful restraint.

¶ 4     At trial, Chaquita Gooden testified that she and defendant were previously in a relationship and shared children. Around 3 a.m. on September 9, 2017, defendant came to Gooden's home. She let him in because they did not live together, and he did not have keys to the house. Gooden then went to sleep. She was awakened by defendant shaking her. Defendant was on the phone with a man Gooden previously dated. Defendant was mad, said his "words," and left after 30 to 40 minutes. When Gooden's son returned home around 6 a.m., defendant reentered the house with a "set look" on his face. Gooden left her bedroom so that defendant could not "corner" her there. Defendant followed her into the living room, closed the door, and drew a small black firearm. Gooden jumped back and attempted to leave. However, defendant began "ranting and raving" that he "should have killed *** [or] pistol whipped" her. Gooden cried and pleaded with defendant to leave, but he refused. At one point, defendant tried to give her the firearm and apologized, but she "threw [her] hands back."

¶ 5     She left the house around 1 a.m. the next day to pick up her daughter from a cousin's home. Gooden explained that she could not leave earlier because defendant took her keys and phone and

_____

[1] In the record, defendant's last name is spelled as both Higgins and Heggins. In this order, we adopt the spelling from defendant's notice of appeal.

did not allow her to leave the house. She did not contact the police because her sons were in the house with defendant. When Gooden returned, defendant was standing in the doorway. She entered the house and sat on the couch. Defendant wanted her to lie down with him and Gooden complied because she was scared and did not want any harm to come to her or the children. Once defendant fell asleep, Gooden dressed, left the house, drove around the corner, and phoned the police. When the police arrived, she let them into the house using her daughter's keys. The police woke defendant, arrested him, and recovered a firearm that she identified as the one defendant held and pointed at her. Gooden did not possess a firearm.

¶ 6 During cross-examination, Gooden testified that she and defendant argued because Gooden was dating someone. Although she and defendant had not been in a relationship "for years," they were previously "on and off" for many years and she acknowledged having been upset in the past when defendant dated someone. Gooden acknowledged that defendant did not draw the firearm until he reentered the house. After defendant drew the firearm, Gooden was upset and cried. She denied watching television with defendant or ordering pizza; rather, defendant ordered pizza. She slept on the left side of the bed, in the same bed with defendant. Defendant took her house keys off the key ring, but not the automobile keys. As the police arrested defendant, she overheard them ask if defendant had anything that he should not have, and defendant reply he had cannabis.

¶ 7 During redirect examination, Gooden testified that officers showed her the recovered firearm and that it was the same firearm that defendant "pulled" on her. She believed that after defendant initially drew the firearm, he put it in his pocket.

¶ 8 Chicago police officer Joseph Tuman testified that after he and other officers were allowed into the house by Gooden, they proceeded to the bedroom where defendant was asleep in the

middle of the bed. The officers woke defendant and told him to exit the bedroom. As Tuman walked to the right side of the bed, he noticed the butt of a firearm protruding from underneath the mattress. Tuman observed two inches of the firearm, which he recovered and described as a blue steel .38-caliber Smith and Wesson. The firearm had a two-inch barrel and contained five rounds of ammunition. Defendant was about three feet from the firearm, which was located at the middle of the bed rather than at the head or foot. When Tuman showed the firearm to Gooden, she identified it as the one that was "displayed." Gooden appeared "shooken up."

¶ 9 During cross-examination, Tuman testified that he was one of three officers present. He did not recover narcotics from defendant and did not know if other officers did.

¶ 10 The State stipulated that defendant was previously convicted of "the felony amount of scheduled substances one and two" in case number 13 CR 2249001.

¶ 11 The defense then recalled Gooden, who testified that she observed the police enter the bedroom, but was not in the room when the firearm was recovered and did not know where it was located. Gooden testified that she did not have company at her home and did not have a boyfriend, but had "contact" with "Jeff," who sometimes slept at her home. Since this incident, defendant had not slept at her home, and she had not slept at defendant's home or engaged in sexual intercourse with defendant. She denied engaging in sexual intercourse with defendant the day before trial.

¶ 12 Defendant testified that he and Gooden lived together for 10 years. After they broke up, he still was in contact with her because they shared three children. When he went to Gooden's home on September 9, 2017, they argued when he "first came in" because he observed a text on her phone indicating she was "messing" with another man. However, he did not have a firearm, did not threaten her, and did not say he wanted her keys. After sleeping, defendant went to the store

and then returned. Later in the day, the family had pizza. Gooden left and then returned. Defendant and Gooden then slept in the same bed although they did not engage in sexual intercourse. He woke to the police "in [his] face." He did not observe the police recover a firearm and there was no firearm on his side of the bed. Defendant told the police that he had marijuana in his pocket.

¶ 13    Since this incident, defendant was in contact with Gooden on a weekly basis when she picked up money for their children. They had engaged in sexual intercourse since this incident, including the day before trial began.

¶ 14    During cross-examination, defendant testified that he went through Gooden's phone when he arrived at her home, found "Jeff's" number, and called Jeff. Defendant denied that the call to Jeff started the argument; rather, it began when defendant went through Gooden's phone and observed a text in which Gooden stated she was "messing with Terrell." Although there was an argument, defendant denied being angry.

¶ 15    The trial court found defendant guilty of UUWF and not guilty of aggravated unlawful restraint. Defendant filed a motion for a new trial, which the court denied. Following a hearing, the court sentenced defendant to 28 months in prison.

¶ 16    On appeal, defendant contends that he was not proven guilty of UUWF when the State failed to prove that he possessed a "firearm" as defined by Illinois law.

¶ 17    When reviewing a challenge to the sufficiency of the evidence, "the question is 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (Emphasis in original.) *People v. McLaurin*, 2020 IL 124563, ¶ 22 (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). The trier of fact is responsible for resolving conflicts in the testimony, weighing the

evidence, and drawing reasonable inferences from the facts presented at trial. *McLaurin*, 2020 IL 124563, ¶ 22. "In reviewing the evidence, this court will not retry the defendant, nor will we substitute our judgment for that of the trier of fact." *McLaurin*, 2020 IL 124563, ¶ 22. A defendant's conviction will be reversed only when the evidence is so unreasonable, improbable, or unsatisfactory that it created a reasonable doubt of his guilt. *People v. Newton*, 2018 IL 122958, ¶ 24.

¶ 18    Here, in order to sustain a conviction for UUWF, the State was required to prove defendant knowingly possessed a firearm after having previously been convicted of a felony. 720 ILCS 5/24-1.1(a) (West 2016); see also *People v. Gonzalez*, 151 Ill. 2d 79, 85 (1992) (determining the "essential elements" of the offense of UUWF are the knowing possession of a firearm and a prior felony conviction). Section 1.1 of the FOID Act defines a "firearm" as, in pertinent part, "any device, by whatever name known, which is designed to expel a projectile or projectiles by the action of an explosion, expansion of gas or escape of gas." 430 ILCS 65/1.1 (West 2016); see also 720 ILCS 5/2-7.5 (West 2016) (stating that except as otherwise provided in a specific section, the term "firearm" has the meaning ascribed to it in section 1.1 of the FOID Act). In the case at bar, defendant does not challenge the evidence demonstrating his prior qualifying conviction; rather, he solely argues the State failed to prove that he knowingly possessed a firearm within the meaning of the statute.

¶ 19    Here, a rational trier of fact could have found that defendant possessed a firearm when Gooden testified that defendant drew a small black firearm, Tuman described the item recovered from the bedroom where defendant slept as a blue steel .38-caliber Smith and Wesson with a two-inch barrel that contained five rounds, and Gooden identified the firearm recovered by officers as

the same one that defendant possessed. Although the object in question was not entered into evidence at trial, we have previously held that the State is not required to "prove the gun is a firearm by direct or physical evidence, [because the] unequivocal testimony of a witness that the defendant held a gun is circumstantial evidence sufficient to establish that a defendant is armed" with a firearm. *People v. Fields*, 2017 IL App (1st) 110311-B, ¶ 36. Here, Gooden testified that defendant threatened her with a firearm and she then identified the firearm once it was recovered by police. Taking the evidence in the light most favorable to the State, we cannot say that no rational trier of fact could have found that defendant possessed a firearm. *McLaurin*, 2020 IL 124563, ¶ 22.

¶ 20    Defendant, however, relies in part on the decision of another panel of this court in *People v. McLaurin*, 2018 IL App (1st) 170258, to argue that Gooden's and Tuman's testimony was insufficient to support the inference that the object at issue was a "firearm" as defined by statute. However, as noted by the State, that case was recently reversed by our supreme court. See *McLaurin*, 2020 IL 124563, ¶ 1.

¶ 21    In *McLaurin*, our supreme court considered whether the State presented sufficient evidence that the defendant possessed a firearm, as defined by the FOID Act, to sustain his armed habitual criminal conviction. See *McLaurin*, 2020 IL 124563, ¶¶ 21-38.

¶ 22    In that case, a police officer testified that she observed the defendant exit an apartment building " 'carrying a silver handgun' " and enter a van. *McLaurin*, 2020 IL 124563, ¶ 4. The officer was approximately 50 feet away and her view was not obstructed. *McLaurin*, 2020 IL 124563, ¶ 4. The van was subsequently curbed by other officers. *McLaurin*, 2020 IL 124563, ¶ 4. The defendant and two other men exited, and a firearm was recovered. *McLaurin*, 2020 IL 124563,

¶ 5. Shortly thereafter, the officer was asked to identify the firearm at a police station. *McLaurin*, 2020 IL 124563, ¶¶ 5-6. She identified the recovered firearm as " 'the same color [and] size' " as the firearm she observed in the defendant's hand. *McLaurin*, 2020 IL 124563, ¶ 5. The officer further testified that during her 12 years as a police officer, she had worked with firearms and was familiar with them. *McLaurin*, 2020 IL 124563, ¶ 5. A second officer testified that a "9-millimeter chrome handgun" was recovered from underneath the van. *McLaurin*, 2020 IL 124563, ¶ 8. The firearm itself was not offered into evidence. *McLaurin*, 2020 IL 124563, ¶ 8. The defendant was found guilty of being an armed habitual criminal and sentenced to seven years in prison. *McLaurin*, 2020 IL 124563, ¶ 16.

¶ 23    The appellate court reversed, determining that the officer's testimony that she observed the defendant with an object she believed was a firearm was insufficient to sustain the conviction. *People v. McLaurin*, 2018 IL App (1st) 170258, ¶¶ 27-28. The court explained that in a firearm possession case, "the item possessed cannot be inferred from circumstantial evidence but must be proven beyond a reasonable doubt to be a firearm as defined by the statute." *People v. McLaurin*, 2018 IL App (1st) 170258, ¶ 24. The supreme court granted the State's petition for leave to appeal.

¶ 24    In analyzing the issue, our supreme court relied on its prior holdings in *People v. Washington*, 2012 IL 107993, and *People v. Wright*, 2017 IL 119561. In *Washington*, our supreme court considered whether the State presented sufficient evidence of a "dangerous weapon" to prove the defendant guilty of armed robbery, aggravated kidnaping, and aggravated vehicular hijacking when the weapon was not recovered and no testimony detailed the size, weight, or metallic nature of the weapon. *Washington*, 2012 IL 107993, ¶¶ 1, 24, 29. In affirming the defendant's convictions, our supreme court relied upon the victim's testimony that the defendant pointed a firearm at him,

forced him into a truck, held the firearm to his head, and again pointed the firearm at him while forcing him into the cargo area of a truck. *Washington*, 2012 IL 107993, ¶ 35. The court noted that the victim, who had an unobstructed view of the weapon for several minutes, testified that it was a firearm and rejected the argument that "it could not be known for sure whether the gun was real or a toy because no gun was ever recovered." *Washington*, 2012 IL 107993, ¶¶ 35-36. As such, considering the victim's "unequivocal testimony and the circumstances under which he was able to view the gun, the jury could have reasonably inferred that defendant possessed a real gun." *Washington*, 2012 IL 107993, ¶ 36.

¶ 25    Similarly, in *Wright*, our supreme court considered whether there was sufficient evidence that a codefendant was armed with a "firearm," as defined in the FOID Act, so as to support the defendant's armed robbery conviction. *Wright*, 2017 IL 119561, ¶¶ 69-77. At trial, the victim testified that the codefendant said " ' "[t]his is a robbery" ' " and lifted a hoodie to reveal what " 'looked like a black automatic, black gun.' " *Wright*, 2017 IL 119561, ¶ 9. The victim further testified that he thought the firearm was semiautomatic, had experience firing such weapons, and that during the incident he " 'felt something sharp in [his] back,' " which he thought was a firearm. *Wright*, 2017 IL 119561, ¶¶ 9-10. The victim was " '100% sure' " the item displayed was an " 'actual firearm.' " *Wright*, 2017 IL 119561, ¶ 29. A second witness testified she saw the handle of a firearm in the codefendant's waistband and a third witness testified not only that he saw the handle of the codefendant's firearm, but that he had seen firearms before and believed that the firearm was a " '9[-]millimeter pistol.' " *Wright*, 2017 IL 119561, ¶ 12. In finding that the evidence was sufficient to prove that the codefendant was armed with a firearm during the robbery, the court stated that its decision was controlled by the rationale expressed in *Washington*, where it "relied

on the testimony of a single witness and concluded that a rational trier of fact could infer from the testimony that the defendant possessed a 'real gun.' " *Wright*, 2017 IL 119561, ¶ 76.

¶ 26    In *McLaurin*, the supreme court relied on both *Washington* and *Wright* to find that although the evidence was "not overwhelming" and no firearm was introduced into evidence, "a rational trier of fact could infer from the testimony presented in this case that [the] defendant possessed a firearm as defined by the FOID Act." *McLaurin*, 2020 IL 124563, ¶¶ 32-35. The court noted that the officer testified she observed the defendant " 'carrying a silver handgun,' " was familiar with handguns, and identified the firearm recovered as being the same size and color as the firearm she observed in the defendant's hand. *McLaurin*, 2020 IL 124563, ¶¶ 33-34. The court rejected the defendant's argument that the evidence was insufficient because it "simply consisted of [the officer's] testimony that she thought she saw a chrome item in defendant's hand that seemed to be a firearm" and did not provide details "including whether it was a semiautomatic or revolver." *McLaurin*, 2020 IL 124563, ¶ 35.

¶ 27    Here, as in *McLaurin,* although no firearm was offered into evidence at trial, there was sufficient evidence that defendant possessed a firearm when Gooden testified that defendant had a small black firearm, Tuman testified that he recovered a firearm, which he described in detail, from the bedroom where defendant was sleeping, and Gooden testified that the firearm recovered by officers was the same one possessed by defendant. Viewing this evidence in the light most favorable to the State, it was not so unreasonable, improbable, or unsatisfactory that no rational factfinder could have found beyond a reasonable doubt that defendant possessed a firearm as defined by the FOID Act. See *McLaurin*, 2020 IL 124563, ¶ 38. Accordingly, we affirm defendant's conviction for UUWF.

¶ 28    For the forgoing reasons, we affirm the judgment of the circuit court of Cook County.

¶ 29    Affirmed.