2025 IL App (1st) 1232358-U

SIXTH DIVISION

March 21, 2025

No. 1-23-2358

**NOTICE**: This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) | Appeal from the Circuit Court of Cook County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 18CR12920 |
| THOMAS CZERWINSKI, | ) ) | Honorable |
| Defendant-Appellant. | ) ) | John Gallagher, Judge, presiding. |

_____

JUSTICE C.A. WALKER delivered the judgment of the court.
Presiding Justice Tailor and Justice Gamrath concurred in the judgment.

**ORDER**

¶ 1   *Held:*   We affirm where the circuit court did not err in admitting evidence of defendant's blood alcohol concentration where the blood was drawn using proper medical procedures; the evidence produced at trial was sufficient to show that defendant was driving under the influence of alcohol; and there was sufficient evidence for a reasonable trier of fact to find defendant's driving under the influence was the proximate cause of the accident resulting in the deceased victim's death.

¶ 2    Following a bench trial, defendant Thomas Czerwinski was found guilty of aggravated driving under the influence of alcohol and reckless homicide. He was sentenced as follows: Count 1, six years Illinois Department of Corrections (IDOC). Count 2, 3 years IDOC concurrent. Count 3, 2 years IDOC concurrent. Counts 4 and 5, 1 year IDOC concurrent." Czerwinski appeals arguing: (1) The trial court erred by considering the Blood Alcohol Content (BAC) evidence when the blood draw was not done using proper medical techniques; (2) the State failed to prove he drove a vehicle while under the influence of alcohol; and (3) the court erred by finding he was a proximate cause of the death of Susan Esparza. For the foregoing reasons, we affirm.

¶ 3                                    I. BACKGROUND

¶ 4    On August 12, 2018, Susan Esparza and her husband Candido Esparza went for a motorcycle ride to meet friends at a bar. The bar was about 40 minutes away from their home in Blue Island, Illinois. After arriving at the motorcycle bar, Candido[1] stated he had "three to four" Bud Lights. He stated that he could not remember if he and Susan went to other places and if they met up with anybody else. They left the bar, and at approximately 9:00 p.m., Thomas Czerwinski, the driver of a Jeep, made a left-hand turn in front of the motorcycle and the vehicles collided. Susan succumbed to her injuries.

¶ 5    At a bench trial, Candido testified that he did not feel intoxicated after having drunk the "three to four" Bud Lights and that the drinks were spread throughout a period of time. After hanging out, he and Susan proceeded to go home on the motorcycle. He was driving while Susan was riding on the back. At that time, it was a "little darker outside" but not pitch black. They were driving down Route 83 and saw a car going in the same direction they were facing. Route 83 has

[1] Due to sharing the same last name "Esparza" we will refer to Candido Esparza and Susan Esparza by their first names.

two lanes of traffic, one going in each direction. Candido stated he had noticed a car that stopped while he drove around the bend. He explained that it looked like the car was resting and this prompted him to stop in the middle of the road. Candido turned around to his wife and said, "what's going on." At this point, the car started driving again and Candido started driving again. Susan grabbed him and said, "I love you." That is the last thing Candido remembered.

¶ 6    Candido explained that he did not remember how fast he was driving when he started moving once again, but that he did not normally speed. The next thing he remembered was being awakened by an EMT named Andy Huffnagle. Candido stated that he knew Huffnagle because he was Susan's first cousin. Candido suffered broken ribs, a broken sternum, a shattered femur, and blood clots in his left leg. He went through many surgeries and was in the hospital a couple days short of a month.

¶ 7    On cross examination, Candido confirmed that he was driving down Route 83 when he noticed a car coming the other way suddenly stopped in the middle of the street. He stated that he had come to a complete stop and once the car began moving again, he started driving again as well.

¶ 8    Lauren Granata, a nanny, testified that she lived in Palos Heights on Massasoit close to Route 83. Around 9:00 p.m. on August 12, 2018, she was in her room when she heard a loud crash. She went to her window and saw car lights sitting in the street. She grabbed her phone, went outside, and saw her neighbor Ken Fry walking towards the street. She stated that her and Ken walked towards the accident and observed a man walking across the street. Lauren explained that the man was walking across the yard away from the accident. She noticed that a Jeep and motorcycle had gotten into an accident, a man was lying in the grass, and a woman lying in the street. She called 911 and approached the woman. Lauren explained that she knelt beside the

woman and told her "everything is going to be okay." The woman did not respond but she noticed that the woman was still breathing.

¶ 9    Joshua Cwik, a firefighter and paramedic, testified that around 9:00 p.m. on August 12, 2018, he was called to a traffic crash on Route 83. When he arrived on scene with his partner Jason Martin, he observed a motorcycle on the ground that had hit a Jeep. He also noticed two patients lying on the ground: one in the middle of the street. He stated that they treated Susan. She was unresponsive and "agonal breathing", which is gasping for air. They gave Susan C-spine precautions, which included holding her neck and preventing any further injury. He and Martin placed her into the ambulance. Once they had treated Susan in the ambulance, they transported her to Christ Hospital.

¶ 10    Janet Ramos, a paramedic with the Chicago Fire Department testified that on August 12, 2018, she was called to a traffic crash on Route 83. She was working with a partner, Martin Cimaglia. Once they arrived on scene, they noticed Czerwinski had a laceration on his forehead and attempted to treat him. They asked him if he had any alcohol that evening, and he denied having any. They asked Czerwinski if he wanted to go to the hospital, but he refused.

¶ 11    On cross examination, Ramos stated that Czerwinski was assigned to her and Cimaglia on the scene. She explained that Czerwinski had denied alcohol use. Ramos understood everything he said, and he answered every question appropriately. Ramos noted that in her and Cimaglia's report, they did not suspect alcohol use; and Czerwinski did not seem to be impaired.

¶ 12    On redirect examination, Ramos stated that Czerwinski was much taller than her. She explained that she was on the scene a total of 17 minutes and a small portion of that was spent talking to Czerwinski.

¶ 13    Nicole Paniaguas, a bartender at Crestwood Off Track Betting (OTB), testified that she waited on three males during her shift on August 12, 2018. She explained that her original shift would have been 10:30 a.m. to 5 p.m. but a coworker had called off for the second shift, and she did a double. She stated that she served Czerwinski and a group of his friends from around noon until 7 or 8 p.m.

¶ 14    The circuit court admitted video footage into evidence. The footage is part of the record on appeal and was reviewed by this court. Channel 15 captured the parking lot of the bar. Channel 16 captured the front door of the bar. Channel 9 captured the foyer area. Channel 13 captured the main bar, where one can see what the bartender is doing. Channel 13 captured in relevant part, Paniaguas pouring two drinks: long pours of vodka, meaning more than one shot of alcohol in each drink at 12:40:01. At 13:03:34 Paniaguas makes a drink with a single shot of vodka for Czerwinski's friend. At 13:05:39 Paniaguas makes two more long pours of vodka and gives the drinks to Czerwinski's friend. At 14:45:32 Paniaguas makes three more long pour drinks of vodka, and brings them to Czerwinski's table where he is seated with friends. At 18:08:08, the footage shows a friend of Czerwinski approaching the bar and from 18:11:55 to 18:12:46, the footage depicts Paniaguas making three long pour drinks and taking them to Czerwinski's group. At 19:14:53 Paniaguas pours two more long pours of vodka and gives them to Czerwinski and his friend. At 19:56:00 the footage shows Paniaguas making two more long pour vodka drinks and giving them to Czerwinski. The court admitted into evidence the receipt from Czerwinski's group's bill. It was $152.44 and the number of drinks were split between long pours and single pours. There were 12 long pours, four single pours, a pizza, and cheese curds.

¶ 15    On cross examination, Paniaguas testified that she would have stopped serving Czerwinski drinks if she thought he was too intoxicated. She mentioned that she was busy and could not "have

one-on-ones with people." She also stated that her training provided her with the knowledge that individuals under the influence of alcohol will sometimes have slurred speech but admitted that "I've also learned that people under the influence of alcohol you can't tell until its too late too."

¶ 16   Jason Strong, a Chicago police officer, testified that he responded to a traffic crash around 9:00 p.m. August 12, 2018. Strong spoke with Czerwinski at the scene and noted that Czerwinski's speech was "kind of slurred" and he "could smell an alcoholic beverage coming from him." Strong informed investigator Gregory Barron of his observations. Strong stated that he noticed Czerwinski walking away from the scene of the accident and yelled for him to come back. Czerwinski complied and Strong placed him in Barron's vehicle.

¶ 17   On cross examination, Strong noted that he had no problems understanding Czerwinski, nor did Czerwinski have problems giving him his identification. Further, Czerwinski's balance was not abnormal.

¶ 18   Gregory Barron, an investigator for the Cook County Sheriff's Police Department, testified that he worked patrol for four and a half years and investigated DUI's and responded to calls for service. He had done around 50 DUI's prior to his testimony. Czerwinski told Barron that he was headed towards Mount Greenwood and had not been drinking, but Mount Greenwood is not near Route 83 and Massasoit and the location Czerwinski was traveling was not toward Mount Greenwood. Barron stated that he was notified by Strong there was a possible scent of alcohol emanating from Czerwinski. Czerwinski was placed in the rear passenger side of Barron's vehicle; the windows were up, the doors were closed, and he was the only person in the vehicle. After about 5 or 6 minutes of his investigation, Barron opened the car door and noted "there was a strong odor of an alcoholic beverage emanating throughout the interior of the patrol car."

¶ 19    Barron conducted a Horizontal Gaze Nystagmus (HGN) test. An HGN test is a standard field sobriety test. Barron stated that Czerwinski showed signs of impairment and wanted to perform other tests, but he refused other tests and refused to give consent for a blood draw. Czerwinski was placed under arrest and Barron was originally directed to transport him to Markham courthouse but was redirected to take him to South Suburban Hospital, as a search warrant was obtained for a blood draw. Barron stated that after transporting Czerwinski, he still smelled the same odor of alcoholic beverage and it was his opinion that based on the HGN test, his observation that Czerwinski's eyes were watery and bloodshot, and the strong odor of alcohol emanating from the interior of his vehicle, Czerwinski was impaired.

¶ 20    On cross examination, Barron explained he had performed an HGN test where he was supposed to make two passes for each of the three clues for which he was looking. Barron admitted he did not make the six passes required and did agree that a recent study showed that a head injury could alter results of the HGN test.

¶ 21    Brian Dignan, a detective with the Cook County Sheriff's Police Department testified that he had been with the office for 17 years. On August 12, 2018, he was tasked with drafting a search warrant for a subject that was involved in a crash where a victim had died. The search warrant was signed by a judge, and Dignan arrived at South Suburban Hospital around 12:37 a.m. on August 13, 2018. After his arrival, he met with Officer Barron, Detective Bohlsen, and the phlebotomist, Linda Cox. He was present when Cox collected the blood and urine samples from Czerwinski. He explained that the hospital had a sealed DUI test kit that was used to collect the samples and an evidence technician named Investigator Weatherly picked up the kit.

¶ 22    Linda Cox, a phlebotomist with 12 years of experience, testified that she was directed to draw blood from Czerwinski. She explained that on average she does 50 blood draws a day. She

collected a DUI kit from the lab and explained that everything needed was included in the kit that she acquired. She broke the seal of the kit in the presence of an officer. She further explained that there is preservative at the bottom of the vials used to collect blood and after collected a seal is placed on the kit.

¶ 23    On cross examination, Cox stated that she did not know who Czerwinski was and had no recollection from which arm she drew his blood. She explained that she did not know whether the blood tubes were manufactured by the same company or someone different. Further, she did not consult any manual instructions with respect to the blood draw, did not know how much blood she drew from Czerwinski, or the chemical composition of the substance at the bottom of the tubes.

¶ 24    Lindsay Simpson, an expert in toxicology and analyzing blood and urine samples, testified that evidence was submitted to her by the police department. She explained that she first received the sealed DUI kit on August 13, 2018. She tested one of the blood tubes for alcohol and explained that she tested Czerwinski's blood 3 times through a machine that determines blood alcohol. The first reading was 0.194, the second reading was 0.196 and the third was 0.197. She further explained that the test she used is generally accepted in the scientific community and she was trained to perform these tests. Her conclusion was that Czerwinski's blood alcohol concentration was 0.195 grams per deciliter.

¶ 25    On cross examination Simpson stated if she added too much "n-propanol" the results of the test would be skewed. She confirmed she did not add too much as it is added through an instrument. On redirect examination, Simpson explained that she runs quality control tests on the instrument she uses for the dilution of the blood with the n-propanol. She further explained that the instrument was working properly after she had done her tests, and the blood in this case was not clotted.

¶ 26   Keith McCarter, a sergeant for the Cook County Sheriff's Police Department, testified that he escorted Czerwinski from the interview room down to the police department's lockup. He stated that Czerwinski smelled heavily of an alcoholic beverage. On cross examination McCarter stated he did not remember how Czerwinski walked when he escorted him down to lockup. He made small talk with Czerwinski and said his speech was a little slurred and confirmed he smelled of alcohol.

¶ 27   Craig Wilk, a police officer with the Cook County Sheriff's Department, testified that he is an accident reconstruction specialist. Wilk stated he investigated the crash, arriving at Route 83 around 11:00 p.m. He determined where the first contact and maximum engagement occurred from the Jeep and motorcycle's final resting points. He noted there was a tire mark that indicated the motorcycle was under heavy braking. He concluded that the Jeep was "spun clockwise" after being struck by the motorcycle. Wilk explained that based on his analysis, the Jeep failed to yield the right of way to the motorcycle.

¶ 28   On cross examination, Wilk testified that he did not weigh either the Jeep or motorcycle., did not measure the wheelbase reduction, but did measure the motorcycle tire marks. He stated that the speedometer of the motorcycle after the accident showed 45 miles per hour. The speed limit was 40 miles per hour. He explained that speed can be an important factor in accident investigation and the proximity between the Jeep and motorcycle at the time the Jeep made the left hand turn was "too close".

¶ 29   On redirect examination, Wilk stated he did not weigh the vehicles because he was unable to do a momentum analysis. He clarified that the speed on the speedometer of the motorcycle was not necessarily the speed at the time of impact. He explained that had Czerwinski not been turning left, the accident would never have happened. On recross examination, Wilk stated he believed the

motorcycle was going 47 miles per hour at the time of impact but noted that his analysis was not reliable.

¶ 30   Dr. Kristin Alvarenga, a deputy medical examiner for the Cook County Medical Examiner's office, testified that Susan's cause of death was blunt-force injuries due to the collision of the motorcycle and the Jeep. She noted that in her opinion, the death of Susan was an accident.

¶ 31   Ronald Henson, an expert in standardized field sobriety tests, blood collection procedures, and behavioral manifestations associated with alcohol consumption, testified that the HGN test should not be performed when head trauma is involved. He stated that the HGN test was administered improperly because Czerwinski was facing flashing lights, the officer did five passes instead of thirteen, and the officer did not administer a vertical nystagmus test. Further, after blood was drawn, the vial should be inverted 8 to 10 times immediately, and a person failing to invert the blood is not using a proper medical technique. He stated that manifestations of a person with a .18 or higher blood alcohol level would include the individual stumbling, having difficulty walking, comprehension issues, slurred speech, and emotional instability.

¶ 32   On cross examination, Henson reviewed videos of Czerwinski from the OTB and stated that there was missing documentation and information associated with the blood draw to determine its reliability. He admitted that not all drunk people act the same but there is "some masking that can't be done." He stated an alcoholic compared to a person drinking for the first time would act differently, and generally, the more times you drink the higher your tolerance becomes. However, your manifestations would not change if you were at a 0.19 BAC level whether you were an alcoholic or first time drinker.

¶ 33 Roger Barrette, a traffic crash investigator and reconstructionist, testified that the motorcycle made impact with the Jeep on its right rear tire. He indicated that the tests he used

placed the motorcycle driving at a speed of either 50.5 miles per hour, 52 miles per hour, or 50.8 miles per hour. He also stated that the pre-braking speed of the motorcycle was 63.2 miles per hour and the Jeep's speed at impact was 8.6 miles per hour. He stated that at the time Czerwinski made the left turn, the motorcycle was not an immediate hazard to him and that more than 50% of all drivers would have executed a similar turn.

¶ 34   On cross examination, Barette admitted he did not review the scene, talk to witnesses, Wilk, or Czerwinski. He stated that it was his opinion that "the accident happened by the Jeep turning left and the motorcycle crashing into the back of the Jeep."

¶ 35   After hearing the evidence and closing arguments, the court found Czerwinski guilty of all counts and sentenced him to six years of imprisonment. This appeal followed.

¶ 36                                     II. JURISDICTION

¶ 37   Czerwinski was sentenced on November 21, 2023. His notice of appeal was timely filed on December 14, 2023. Accordingly, this court has jurisdiction pursuant to article VI, section 6, of the Illinois Constitution (Ill Const. 1970, art. VI, § 6) and Illinois Supreme Court Rule 603 (eff. Feb. 6, 2013).

¶ 38                                      III. ANALYSIS

¶ 39   On appeal, Czerwinski argues that (1) The trial court erred by considering the Blood Alcohol Content (BAC) evidence when the blood draw was not done using proper medical technique; (2) the State failed to prove he drove a vehicle while under the influence of alcohol; and (3) the court erred by finding he was a proximate cause of the death of Susan Esparza.

¶ 40                         A. Blood Alcohol Content (BAC) Evidence

¶ 41   First, Czerwinski argues the circuit court erred because it considered the BAC evidence where the blood draw was not done using proper medical technique. The State asserts that this

argument was forfeited because Czerwinski did not file a motion *in limine* barring the results of his BAC test or make an objection to admission at trial. Our supreme court has held that "when a defendant procures, invites, or acquiesces in the admission of evidence, even though the evidence is improper, he cannot contest the admission on appeal." *People v. Bush*, 214 Ill. 2d 318, 332 (2005). Czerwinski has forfeited this issue. *Id*. But despite his forfeiture, we will consider Czerwinski's argument as forfeiture is a limitation on the parties and not the court. *People v. Sophanavong*, 2020 IL 124337.

¶ 42    Specifically, Czerwinski asserts that the trained phlebotomist did not invert the vials of blood immediately. Section 11-501.2 of the Code governs admissibility of the results of blood-alcohol tests in DUI proceedings. See 625 ILCS  5/11-501.2. In relevant part, Section 11-501.2(a)(1) stipulates that for a chemical analysis of a person's blood to be deemed valid under this section, the analysis must have been conducted in accordance with the standards established by the Department of State Police. The Department of State Police promulgates standards for the collection of blood to ensure the validity of the analysis because the legislature delegated to Department of State Police the authority to do so. 625 ILCS 5/11-501.2(a)(1).

¶ 43    These standards are established in title 20 of the Illinois Administrative Code. See 20. Ill. Adm. Code 1286.320. Interpretation of administrative regulations or rules are a question of law, and the principles of statutory interpretation apply. *People v. Morris*, 394 Ill. App. 3d 678, 680 (2009). The code requires "the blood sample shall be collected in the presence of the arresting officer, another law enforcement officer, or an agency employee who can authenticate the sample" and "the blood sample should be drawn using proper medical technique." See 20. Ill. Adm. Code 1286.320(c).

¶ 44    Here, the record supports the contention that Czerwinski's blood was drawn by a certified phlebotomist, with 12 years of experience. Cox testified that the sealed DUI kit was from the lab and the seal was broken in the presence of an officer. While Cox did not testify that she inverted the vials of blood after she drew them, the record does not indicate that she failed to do so. Simpson testified that vials in the DUI kit contained "powder anticoagulant and preservative in the bottom of the tube". The powder anticoagulant in the tube is to make sure the blood does not clot. She further explained that if a blood sample were clotted, it would impact how well her pipe head can absorb the liquid blood sample. A review of the record supports Simpson did not encounter any problems with the blood draw. We find that a sufficient foundation was established to demonstrate that Czerwinski's blood samples were collected using proper medical technique, in compliance with the procedures outlined in section 1286.320 of the Illinois Administrative Code, as the testimony of Cox and Simpson did not imply otherwise. On this record, the trial court did not err in finding that the evidence of the defendant's blood-alcohol concentration was admissible at trial.

¶ 45

¶ 46                    B. Drove a Vehicle While Under the Influence of Alcohol

¶ 47    Next, Czerwinski contends the State failed to prove he drove a vehicle while under the influence of alcohol. He argues that a review of the evidence will indicate that he was not intoxicated. The State asserts that the circuit court found the evidence of Czerwinski's intoxication was overwhelming, and that this court should not reweigh the evidence and substitute its judgment for that of the trier of fact.

¶ 48    A conviction will be overturned only where "the evidence is so unreasonable, improbable or unsatisfactory" that there is reasonable doubt as to the defendant's guilt. *People v. Wright*, 2017 IL 119561, ¶ 70. Section 5/11-501.2 of the Illinois Vehicle Code prohibits individuals from

"driving or being in actual physical control of any vehicle *** while *** under the influence of alcohol." 625 ILCS 5/11-501.2. To sustain a conviction of DUI, the State must prove the defendant was in actual physical control of a vehicle while under the influence. *People v. Tatera*, 2018 IL App (2d) 160207. A defendant is deemed under the influence when, as a result of consuming alcohol or any other intoxicating substance, "his mental or physical faculties are so impaired as to reduce his ability to think and act with ordinary care." *People v. Gordon*, 378 Ill. App. 3d 626, 631 (2007). Intoxication is a matter for the trier of fact to decide, along with evaluating the credibility of the witnesses and determining the sufficiency of the evidence. *People v. Janik*, 127 Ill. 2d 390, 401 (1989). The State may rely on circumstantial evidence to prove that a defendant committed the crime of DUI. *People v. Diaz*, 377 Ill. App. 3d 339, 345 (2007).

¶ 49    Czerwinski relies on *People v. Barham*, 337 Ill. App. 3d 1121 (5th Dist. 2003) to argue that the evidence was insufficient to find he was intoxicated while driving. In *Barham*, the court reversed defendant's conviction of reckless homicide holding, "There is no question that defendant consumed alcohol, but the quantity was not established. *** There is no evidence that defendant's physical and mental abilities were impaired by alcohol at the time of the accident."

¶ 50    *Barham* is distinguishable because here, the record supports the contention that Czerwinski was under the influence of alcohol and in actual physical control of a vehicle. More than one officer testified to the smell of alcohol on Czerwinski. Also, surveillance footage and receipts from the OTB proves Czerwinski was with a group of friends who ordered 16 alcoholic drinks. More importantly, his BAC was "0.195 grams per deciliter" and the legal limit is 0.08. See 652 ILCS 5/11-501.2(b)(3) ("If there was at that time an alcohol concentration of 0.08 or more, it shall be presumed that the person was under the influence of alcohol.")

¶ 51 Officer Strong testified that Czerwinski smelled of alcohol and his speech was "kind of slurred". During the traffic crash investigation, Barron placed Czerwinski in the back of a squad car. After Czerwinski had been in the vehicle for 5 to 6 minutes, Barron opened the door and immediately smelled a strong odor of alcohol emanating from the vehicle. Additionally, on the drive to the courthouse, Barron testified he smelled the same odor of alcoholic beverage and noted that Czerwinski's eyes were watery and bloodshot. A review of the record also shows that Sergeant McCarter noticed Czerwinski smelled heavily of alcohol. We find the testimony of multiple officers, in addition to Czerwinski's BAC of 0.195, was sufficient to establish that he was under the influence of alcohol while in actual physical control of his vehicle.

¶ 52                     C. Proximate Cause of Death

¶ 53 Finally, Czerwinski contends the trial court erred in finding that he was a proximate cause of the death of Susan Esparza. Essentially, Czerwinski contests the sufficiency of the evidence that supported his conviction.

¶ 54 In reviewing a sufficiency of the evidence claim, we must determine whether after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, (1979). A conviction will only be reversed where the evidence is "so unreasonable, improbable, or unsatisfactory as to justify a reasonable doubt of defendant's guilt." *People v. Ortiz*, 196 Ill. 2d 236, 259 (2001).

¶ 55 Our Supreme Court held in *People v. Hudson*, 222 Ill. 2d 392, 401 (2006) that proximate cause is based in cause in fact and legal cause. Cause in fact is established if there is a "reasonable certainty" that defendant's actions caused injury or damage. *Kramer v. Szczepaniak*, 2018 Ill. App. (1st) 171411. "A defendant's acts are a legal cause only if they are 'so closely tied to the plaintiff's

injury that he should be legally responsible for it.'" *Simmons v. Garces*, 198 Ill. 2d 541, 558 (2002). The key principle of legal causation is foreseeability. *City of Chicago v. Beretta U.S.A Corp.*, 213 Ill. 2d 351, 395 (2004).

¶ 56    This court has held that when an aggravated DUI charge under section 11-501(d)(1)(F) is premised on a violation of section 11-501(a)(1) for driving with blood alcohol content over 0.08, the "proximate cause" element of the aggravated offense requires only that the death was caused by the defendant's driving. *People v. Merrick*, 2012 IL App (3d) 100551, ¶¶ 25-27 (rejecting the defendant's argument that there was "insufficient proof that his alcohol consumption was the proximate cause of the motor vehicle accident"); *People v. Ikerman*, 2012 IL App (5th) 110299, ¶ 50 ("proximate cause requires the State to show a causal link between the physical act of driving and another person's death"). The State only needed to prove Czerwinski was driving with a blood alcohol level over 0.08, and his driving was the proximate cause of Susan's death.

¶ 57    In this case, the circuit court found a causal link between the physical act of driving and the victim's death. See 625 ILCS 11-501(d)(1)(F) ("Every person convicted of committing a violation of this section shall be guilty of aggravated driving under the influence of alcohol, other drug or drugs, or intoxicating compound or compounds, or any combination thereof if *** the person, in committing a violation of subsection (a) was involved in a motor vehicle crash or *** accident that resulted in the death of another person, when the violation of subsection (a) was a proximate cause of the death.")

¶ 58    We find that the circuit court did not err when it found a causal link between Susan's death and Czerwinski's driving because it is undisputed that Czerwinski was the driver of the Jeep that collided with the Esparza's motorcycle. Furthermore, surveillance footage of Czerwinski at the OTB showed that he and a group of friends were drinking alcohol that was also confirmed by the

group's receipt. Multiple officers testified that Czerwinski smelled of alcohol and his BAC was 0.195, which is above the legal limit. Expert testimony elicited by the State's witness showed that Czerwinski, while making a left turn in front of oncoming traffic, failed to yield to Esparza's motorcycle, causing the collision to occur. Although the court did find that Candido was likely speeding, this is not enough to reverse Czerwinski's conviction because a reasonable person could foresee injury as a result of being under the influence of alcohol and operating a vehicle. *People v. Johnson*, 392 Ill. App. 3d 127 (4th Dist. 2009). Thus, we reject Czerwinski's argument that the State could not prove proximate cause. We will not reverse a conviction unless the evidence is "so unreasonable, improbable, or unsatisfactory as to justify a reasonable doubt of guilt." *Ortiz*, 196 Ill. 2d 236, 259 (2001). Thus, Czerwinski's argument fails.

¶ 59                                    IV. CONCLUSION

¶ 60    For the foregoing reasons, the judgment of the circuit court is affirmed.

¶ 61    Affirmed.